TIOGA COUNTY GENERAL HOSPITAL, Plaintiff, v. GEORGE N. TIDD, Defendant.

Supreme Court, Trial and Special Term, Tioga County, August 18, 1937.

*Hinman, Howard & Kattell* [*C. Addison Keeler* and *A. Lawrence Abrams* of counsel], for the plaintiff.

*Lee, Levene & McAvoy* [*David F. Lee* and *David Levene* of counsel], and *Simpson, Thacher & Bartlett* [*Robert H. O'Brien* of counsel], for the defendant.

McNAUGHT, J.   The plaintiff seeks to recover the amount of a subscription by the defendant to the construction and equipment fund for the Tioga County General Hospital at Waverly, N. Y., with a proviso that the X-ray room in the hospital to be constructed should be dedicated as a memorial to Charles W. Tidd, father of the defendant.   The subscription was made on the 20th day of March, 1929, and was for the sum of $7,200.   Thereafter the defendant purported to cancel such subscription, has refused to pay the same, and the action is brought to recover the amount thereof.

A clear understanding of the condition and circumstances under which the subscription was made and attempted to be canceled, requires a statement of some of the historical facts disclosed by the evidence.

The village of Waverly is situate in the county of Tioga in the State of New York.   It is closely adjacent to the Pennsylvania State line.   Sayre, Athens and some other small communities are also adjacent to the State line, in the State of Pennsylvania.   The towns virtually run into each other and constitute in effect one community.

The Robert Packer Hospital, a large and well-known institution, is located at Sayre.   It has been in existence for over fifty years. The Packer Hospital was operated as what is known as a " closed " hospital in the medical profession, which, it is established, requires that patients treated in the hospital must be treated or operated upon by members of the staff of such hospital.   It appears there has been some modification of the strictness of a " closed " institution in that now, and for some time past, physicians have been allowed to bring patients to the hospital and treat them medically, but no operative surgery can be performed except by a member of the Packer Hospital staff.

Efforts were made to modify the closed character of the Packer Hospital, which were unsuccessful, and in 1910 there was organized in Sayre an institution called the People's Hospital, originally a residence owned by one Dr. Theodore Wright, to which additions

were built and from time to time the capacity enlarged. This institution was located in close proximity to the Packer Hospital.

In the year 1928, the facilities of the People's Hospital having become inadequate and somewhat obsolete, it was proposed to rebuild and enlarge it. There was no hospital located in the county of Tioga in New York State, and the nearest hospital facilities were at Elmira, nineteen miles west, a maternity hospital at Towanda, Pa., a hospital at Ithaca, thirty-six miles west, and hospitals in Endicott, Johnson City and Binghamton, approximately forty miles east.

A movement was started to build a hospital at Waverly, instead of rebuilding the People's Hospital at Sayre, for the accommodation of five counties and surrounding territory without hospital facilities. Meetings were called and held and in June, 1928, the subject was informally discussed at a meeting held in the high school in Waverly. In January, 1929, a so-called organization meeting was held in Waverly. At this meeting officers were elected. The name " Tioga County General Hospital " was adopted. The organization was termed the general committee. An executive committee was appointed, and such executive committee with the officers were given power to take such steps as might be necessary to finance and carry the project to completion. An architect was consulted and presented tentative plans. The records of the proceedings show that the general plan adopted was subsequently carried out. Officers were authorized to make contracts; an architect was employed, and a contract was entered into with a finance company to raise money for the construction of the hospital. In February, 1929, one Mrs. Cooper tendered a gift of a four-acre site of land for the new hospital, which was accepted. In February the executive committee was authorized to borrow funds to cover the cost and expense of a financial campaign, and money was borrowed from the banks in Waverly, the notes being signed in the name of Tioga County General Hospital by its treasurer. The campaign to raise funds was conducted; the hospital was constructed; the Tioga County General Hospital was thereafter formally incorporated, and it has since 1930 been in operation.

In January, 1929, it was decided that the objective of the campaign to raise funds be fixed at $300,000. A campaign for raising funds was discussed, which included a plan providing that the cost of construction of various units be estimated and subscribers offered the right, in return for their subscriptions of the amount of the cost of such unit, to have the same dedicated as a memorial in honor or in memory of some person to be named by them. A booklet was prepared and printed, explaining the memorial plan

and containing a description and illustrations relative to the proposed Tioga County General Hospital. The booklet was generally circulated and interested parties were asked to give names of persons whom they thought would be interested in purchasing memorials. Among the names suggested was that of the defendant, a native of the vicinity, whose family had resided at Athens and who, as a young man, had been employed and had lived in Waverly. The defendant, it would appear from the evidence, had always retained an interest in the community of his birth, although he had become a successful and prominent financier. Dr. Edward N. Cowell, a physician and surgeon residing at Athens, Pa., had practiced his profession in that community for more than fifty years. He knew the defendant, and was the Tidd family physician for a great many years. He had suggested the name of the defendant as a possible subscriber for a memorial. Dr. Cowell and Dr. Harry S. Fish, both of whom were interested in the movement, went to New York city after Dr. Cowell had made an appointment with the defendant, and visited him at his office at 30 Church street on the morning of March 20, 1929.

There is practically no dispute as to essential facts in the testimony of Dr. Cowell, Dr. Fish and the defendant as to what occurred, or what was said at the meeting in the defendant's office, excepting upon one important issue. It is conceded that the meeting was cordial and agreeable; that the project was explained, and the defendant advised as to the situation; that the memorial plan was discussed; that a memorial booklet was at least present; that the defendant said there was a memorial he wanted for his father, the X-ray room; that he asked the amount of the subscription necessary to dedicate the X-ray room as a memorial to his father; that Dr. Cowell produced a subscription card upon which was typewritten the name of the defendant; that the defendant took out his pen, crossed off his own typewritten name and wrote above his name at the top of the card the name of his father; that while the word " Memorial " had been stamped upon the card, Dr. Fish wrote in parenthesis with his pen the word " (Memorial) " after the name of the defendant's father as he had written it; that the card was filled in with the amount " seventy-two hundred " by the defendant and he then signed the card with his name and address.

The dispute in the testimony relative to this visit relates practically in its entirety as to what was said relative to the Robert Packer Hospital. The defendant testified that when he was asked if he would contribute to the fund for the hospital at Waverly, he said: " ' Now, wait a minute. I am interested in the Robert Packer Hospital and I would not think of doing anything that is

not agreeable there.' Well, he said, either Dr. Cowell or Dr. Fish, and I think both of them, they were both talking, he said ' It is more than agreeable. It is agreeable to the Packer Hospital. They wish this hospital to be constructed. They have not enough rooms now and it will be in no wise competitive and it is entirely agreeable with them.' I said ' If that is the case, why, all right,' and then I turned and said ' Doctor, what is your idea of the amount of subscription I should make? ' The Doctor said ' Now,' he says ' I think in honor of your father it would be very nice if you could give the X-ray room.' I said ' How much is that? ' and he said ' $7200.' I said ' All right, I will do it.' " The defendant stated he had no recollection of having seen the memorial booklet.

Dr. Fish's version of the conversation is in substance that after he had told the defendant the Tioga County General Hospital was to be erected in Waverly, the defendant interrupted him and said: " ' Let me see, there is another hospital up there, isn't there, by the name of the Packer Hospital? ' I said ' Yes, Mr. Tidd.' He said ' What about that? ' I said ' The Packer Hospital is a very fine institution. It has existed in Sayre since 1885. It has continued to grow through that period of time but the Packer Hospital at Sayre, Pennsylvania, is a closed hospital and the Peoples Hospital was developed in Sayre in 1910 and by reason of the fact that the Packer Hospital was closed and denied to the doctors of that community to render their work.' " Dr. Fish further testified he then described the People's Hospital, where it was located; that it was practically adjoining the Packer Hospital property; that it was obsolete; that the two hospitals had existed side by side for a period of nineteen years, " and Mr. Tidd made no further inquiry of me as regards the Packer Hospital or any conflict between the two hospitals in any way, shape or manner in connection with that conversation." He subsequently, upon being recalled, testified that neither he nor Dr. Cowell told the defendant that the construction of the Tioga County General Hospital was agreeable to the Robert Packer Hospital; that the Robert Packer Hospital wished the Tioga County General Hospital to be constructed, or in words or substance, that it was in no wise competitive with the Robert Packer Hospital. Dr. Cowell was somewhat hard of hearing, but so far as he could testify relative to the conversation, he corroborated Dr. Fish's testimony.

Upon leaving the defendant's office with the signed subscription card, Dr. Fish sent a telegram to Waverly, announcing the defendant's subscription, and at a dinner on the evening of the same day of those engaged in working in the campaign to raise funds and those

interested in the project, the telegram was read and the subscription announced.

One Dixon, an employee of the Robert Packer Hospital, who also was engaged as a side enterprise in some newspaper work, was present at the dinner. The testimony is not satisfactory, but it does clearly appear that on the same evening officials of the Robert Packer Hospital became aware the defendant had made the subscription in question. By means not clearly disclosed by the testimony, a meeting of the trustees and superintendent and other officials interested in the Packer Hospital was held ate the same night, and as one of the results of action taken at such meeting, one Keefe, a member of the board of trustees, was designated to contact the defendant and ascertain why he had made the subscription. Keefe called the defendant on the telephone from Wilkes-Barre, Pa., the next noon and advised him that the executive board had had a meeting, learned of his subscription to the Tioga County General Hospital, and asked him if he would tell what representation was made to him to secure the subscription. Keefe testified that the defendant told him that Doctors Cowell and Fish had called on him, represented to him there was need of additional hospital facilities in the community, and that the building of a new hospital was entirely agreeable to the Robert Packer Hospital. Keefe further testified that he advised the defendant it was not agreeable, was unnecessary, and would be a burden upon the people of the community, and that the defendant said to him, " I will cancel my subscription."

It also appears that Mr. Edward E. Loomis, a member of the board of trustees of the Packer Hospital, president of the Lehigh Valley Railroad, for some reason called the defendant relative to his subscription, and the defendant advised him that he had canceled it.

On the evening of March twenty-first the defendant wired Dr. Cowell at Athens, Pa.: " Regret circumstances which I will explain by letter must ask you to withdraw and cancel my subscription to Tioga Hospital." On March twenty-third the defendant wrote Dr. Cowell from Scranton, Pa., and sent a copy of the letter to Dr. Fish, in which he stated in substance that he had learned that the erection of the Tioga County General Hospital was not entirely agreeable to the Packer Hospital, and in which he suggested consolidation of the institutions and the extension of the Packer Hospital.

No payments were made on account of the subscription by the defendant. The campaign to raise funds for the construction and equipment of the Tioga County General Hospital was com-

pleted, the hospital was erected, the X-ray room was installed therein, a small plaque was placed upon the door reading: " Memorial — Charles W. Tidd." Subsequently, the defendant refusing to pay, this action was brought.

The plaintiff claims there was a valid bilateral contract entered into; that there were mutual promises and mutual conditions to be performed; that the plaintiff has kept and performed its part of the agreement; that the defendant has failed to do so and is liable.

The defendant denies liability and asserts four defenses: *First*, that the subscription in question was obtained from him through misrepresentation which justified its cancellation; *second*, that there is no consideration for his promise to pay; *third*, that the agreement is void, no sufficient memorandum thereof having been made to comply with the Statute of Frauds (Pers. Prop. Law, § 31); *fourth*, that the plaintiff is not the real party in interest and cannot maintain this action.

Confusion has long existed relative to the rules to be applied to charitable subscriptions. The law has been unsettled. A naked promise to give without consideration not being enforcible, the doctrine of contractual relationship was evolved to sustain liability upon a promise if there was any consideration whatever for the promise, and lately has been supplemented and extended by the doctrine of so-called promissory estoppel. Numberless cases may be found in the reports in which charitable subscriptions and liability thereon have been discussed. It is impossible to reconcile many of the decisions. It is manifest from a reading of the cases that there has been a constant trend to find just and well-founded reasons to enforce liability and prevent the evasion of obligations which in good conscience should be performed. The Court of Appeals of our State, as long ago as 1854, said: " An attempt to reconcile all the cases which have been adjudged, touching the validity of voluntary engagements to pay money for charitable, educational, religious or other public purposes, would be fruitless; for, while circumstantial differences in the cases will explain and satisfactorily account for some of the diversities in the decisions, it will be found that there is, to some extent, a want of harmony in the principles and rules applied as tests of validity to that class of undertakings. The general principle is recognized in every case, that all simple contracts executory, whether in writing or verbal, must be founded upon a good consideration, and that the want of a legally adequate consideration, that is, a consideration recognized as sufficient in law, will vitiate every executory contract not under seal; still, the objection of a want of consideration for promises like the one before us has not always been regarded with

favor; and judges, considering defences of that character as breaches of faith towards the public, and especially towards those engaged in the same enterprise, and an unwarrantable disappointment of the reasonable expectations of those interested, have been willing, nay apparently anxious, to discover a consideration which would uphold the undertaking as a valid contract; and it is not unlikely that some of the cases, in which subscriptions have been enforced at law, have been border cases, distinguished by slight circumstances from agreements held void for a want of consideration." (*Barnes* v. *Perine,* 12 N. Y. 18, 23, 24.)

The *Barnes* case has been followed by a long line of cases which blazed the way for the principles more recently enunciated, in which will be found a full review of the earlier cases and the doctrines upon which they were decided. (*Keuka College* v. *Ray,* 167 N. Y. 96; *Allegheny College* v. *National Chautauqua County Bank,* 246 id. 369. See, also, *I. & I. Holding Corporation* v. *Gainsburg,* 251 App. Div. 550.)

The problem of consideration in charitable subscriptions has received the attention, not only of the courts, but of distinguished authorities from academic halls. (See article by Billig, 12 Cornell Law Quarterly, 467, in which the problem is clearly and exhaustively discussed; also article by Carver, 13 Cornell Law Quarterly, 270.)

In *Keuka College* v. *Ray* (*supra*), GRAY, J., writing for the court, at pages 99, 100, said: " the discussion is reduced simply to this, whether the agreement which is sought to be enforced, and which is a voluntary promise on the part of the defendant, expressly, or impliedly, either imposes upon the promisee some obligation, which is assumed, or requests of the promisee the performance of services, which are to be performed upon the strength of the promise. If those conditions are met, then, within the rule of law, there is a consideration which will suffice to uphold the agreement, or the promise."

In the same case the court held the doctrine well established that if money is promised to be paid upon condition the promisee will do some act or perform certain services, then, upon performance, payment may be compelled, holding (p. 100) that such condition may be implied. " Nor need a request to the promisee to perform the services be expressed in the instrument; it may be implied. (*Trustees of Hamilton College* v. *Stewart,* 1 N. Y. 581; *Barnes* v. *Perine,* 12 id. 18; *Presb. Church of Albany* v. *Cooper,* 112 id. 517.) " It was also held that where the question was between the original parties to the instrument proof might be made of the consideration and of such facts, attending the making and delivery of the note, as were not inconsistent with the instrument (p. 101).

In *Allegheny College* v. *National Chautauqua County Bank* (*supra*) the general subject of charitable subscriptions was discussed at length by Chief Judge Cardozo, who wrote the opinion of the court. Cases were referred to and analyzed. The necessity of consideration was discussed and the growth of the doctrine of promissory estoppel as a substitute for consideration was referred to, the court saying (at p. 374): " Certain, at least, it is that we have adopted the doctrine of promissory estoppel as the equivalent of consideration in connection with our law of charitable subscriptions."

We consider it unnecessary to discuss the cases relative to charitable subscriptions at greater length. Out of the vast host, without question we still have the necessity of consideration, or an equivalent, promissory estoppel. We have the fact that consideration or estoppel may be implied if the necessary facts are established.

A determination as to the liability of the defendant in this case requires consideration of four questions, viz.:

1. Was there misrepresentation which induced the defendant to make the subscription?

2. Was there consideration for the promise of defendant?

3. Is the Statute of Frauds a defense?

4. Can the plaintiff maintain the action as the real party in interest?

The defendant contends it was represented to him by Drs. Cowell and Fish that the erection of the proposed Tioga County General Hospital was agreeable to the Robert Packer Hospital, that such institution was overcrowded, and the erection of the proposed hospital was in no way competitive. If such representation was made intentionally and for the purpose of deceiving the defendant, it would justify cancellation of his agreement. If. the statement was made honestly and with no intent to deceive, but was a misrepresentation of a material fact, the defendant would likewise be entitled to cancel his agreement. (*Bloomquist* v. *Farson*, 222 N. Y. 375; *Leary* v. *Geller*, 224 id. 56; *Seneca Wire & Mfg. Co.* v. *Leach & Co.*, 247 id. 1.)

The burden of proving misrepresentation rested upon the d fendant. The sole testimony relative to the conversation in the defendant's office is that of the defendant, Dr. Fish and Dr. Cowell. A careful review of the testimony of these three witnesses, together with the testimony of Dr. Carpenter, who testified that he had a conversation, just prior to the commencement of the campaign for funds, with Dr. Guthrie, the superintendent and head surgeon of the Robert Packer Hospital, in which Dr. Guthrie told him, " I want to assure you, in spite of reports to the contrary, that

neither myself or any member of my staff, my organization, as far as I know, has said anything detrimental to this enterprise; I hope it is a success, and I hope you raise every dime you went after," coupled with the somewhat unsatisfactory lack of recollection on the part o Dr. Guthrie, as appears from a perusal of his testimony, compels us to reach the conclusion that the defendant has failed to meet the burden of proof resting upon him to establish that there was either an intentional or unintentional misrepresentation of a material fact at the time his subscription was signed.

The telegram of cancellation in no manner indicates it was based upon misrepresentation. The letter written to Dr. Cowell by the defendant from Scranton on March twenty-third, explaining or excusing the cancellation, is somewhat confused and lacking in frankness.

The whole record indicates that the cancellation of his subscription by the defendant was at the solicitation of the officials of the Robert Packer Hospital. The hastily-called meeting upon the evening the subscription of the defendant was announced at the campaign dinner; the designation of the witness Keefe to contact the defendant; the manifest fact that the offices of Mr. Loomis were enlisted, indicates that the cancellation was due to the solicitation of representatives of the Packer Hospital, and not to misrepresentation. Upon the entire record we hold that the defendant has failed to establish there was misrepresentation in securing his subscription.

Was there consideration for the subscription of the defendant? It is well settled that the mutual promises of pledgors to pay contributions for a charitable purpose is not a sufficient consideration upon which the promisee may enforce liability. (*Presb. Church of Albany* v. *Cooper*, 112 N. Y. 517; *Twenty-third St. Bap. Ch.* v. *Cornell*, 117 id. 601.) In this instance, however, the evidence clearly establishes, and it is not disputed by the defendant (it is corroborated by him), that he made his subscription in consideration that the X-ray room of the proposed hospital should be designated as a memorial to the memory of his father, Charles W. Tidd. The defendant himself so recognized. He crossed out his own name upon the card and inserted the name of his father; the word " (Memorial) " was written after his father's name in his presence, irrespective of whether the stamped word " Memorial " was upon the card at the time he signed, or not. He inserted, as the amount of his subscription, in his own handwriting, the sum " seventy-two hundred," which was not the amount of a voluntary contribution, but was the amount of the specified subscription for the X-ray room as a memorial, as set forth in the booklet describing

and relating to memorials. The defendant knew the purpose for which his subscription was to be applied. He knew that the consideration was the dedication of the X-ray room to the memory of his father; he stated that he made his subscription for that purpose. He testified: "The Doctor said ' Now,' he says, ' I think in honor of your father it would be very nice if you could give the X-ray room.' I said ' How much is that? ' and he said ' $7200.' I said ;' All right, I will do it.' " We are of the opinion beyond question :that this agreement was based upon a consideration. There was an implied agreement, at least, upon the part of the promisee to build the hospital, or there could not be any X-ray room to dedicate to the memory of the defendant's father. The hospital was built; 'the X-ray room was constructed; it was made a memorial to the :defendant's father, and has existed from the opening of the hospital ;until the date of trial. The extent of the consideration is of no importance. Charitable gifts are not founded upon full and 'adequate consideration dollar for dollar.

The defendant contends the contract or agreement is unenforcible because there was not a sufficient memorandum thereof under the provisions of the Statute of Frauds (Pers. Prop. Law, § 31). The memorandum necessary to take an agreement or promise out of the ,statute does not necessarily have to include every detail of the 'agreement; it must sufficiently express the agreement and sufficiently indicate a consideration, but it may be supplemented by other papers or documents, and there may be implications arising from the contract which also obviate the statute. We are of the opinion, without an extensive analysis of the cases, and assuming the Statute of Frauds was applicable to the contract in this case, ,that the memorandum signed by the defendant is sufficient to ,satisfy the requirements of the statute, and we deem it unnecessary to determine whether the fact that the contract could of itself 'have been performed within a year would take it out of the statute. '(*Seymour* v. *Warren*, 179 N. Y. 1; *Marks* v. *Cowdin*, 226 id. 138; *Berman Stores Co.* v. *Hirsh*, 240 id. 209; *Mesibov, Glinert & Levy* v. *Cohen B. Mfg. Co.*, 245 id. 305; *Franklin Sugar Refining Co.* v. *Lipowicz*, 247 id. 465; *Bowers* v. *Ocean Accident & Guarantee Corp., Ltd.*, 110 App. Div. 691; affd., 187 N. Y. 561; *Delaware Mills, Inc.*, v. *Carpenter Bros., Inc.*, 200 App. Div. 324; affd., 235 N. Y. 537.)

Here we have a contract. What was the contract? The promisee was proposing to erect and equip a hospital. It offers to the defendant the right to select the X-ray room, in the hospital to be erected, as a memorial to his father. It specifies that if so selected, the defendant shall pay to the promisee for the charitable purposes in which it is engaged, the sum of $7,200. The defendant

said, " I will do it." That was the agreement. What does the card signed by the defendant say? It recites, taken as a whole, that for the purpose of the construction and equipment fund and in consideration of pledges of others, the defendant will pay the sum of $7,200, which is made payable in six equal semi-annual installments, but there is no provision but what the same might be paid at any time. The defendant in his own handwriting inserts the name of his father, Charles W. Tidd, and it is designated as a memorial subscription.

Accompanying, and as a part of the transaction (and what may well be regarded as a part of the agreement), is the booklet, " Names that will Live," designating memorials and the price of each, and specifying that of the X-ray room as $7,200. That such booklet was present in the office of the defendant at the time of the transaction s well established. We are of the opinion that upon the facts, and within the rules enunciated in the cases cited, the Statute of Frauds is unavailing as a defense to the liability of the defendant upon his subscription agreement for this charitable purpose.

As a final defense, it is sought to avoid liability on the part of the defendant by urging that the plaintiff cannot maintain the action; that it is not the real party in interest. Considerable stress is laid upon this somewhat technical objection. If it is good, however, the plaintiff cannot recover. It is, to a great extent, a question of procedure, and we are to bear in mind: " All procedure is merely a methodical means whereby the court reaches out to restore rights and remedy wrongs; it must never become more important than the purpose which it seeks to accomplish." (*Clark* v. *Kirby*, 243 N. Y. 295, 303.)

The general committee with its executive committee, which adopted the name, conducted the campaign, and erected the Tioga County General Hospital, was a voluntary, unincorporated association, organization or entity — whatever term may be used — which subsequently was transformed under statutory provisions into the present corporate plaintiff. The plaintiff corporation succeeded to all of the rights, property, pledges and subscriptions which had been made to the Tioga County General Hospital. The plaintiff corporation erected the hospital building, equipped it, nstalled the memorial plaques, made all the contracts in relation to it, and performed all the obligations of the so-called general committee. The general committee was, to al intents and purposes, an unincorporated association which subsequently became incorporated. (Membership Corporations Law, § 12.) It has been held that under such conditions the plaintiff corporation is the proper party to institute actions to recover upon liabilities to the unincorporated body. (*Presbyterian Society* v. *Beach*, 74 N. Y. 72.)

It appears that on or about December 18, 1929, certain of the unpaid pledges made to the Tioga County General Hospital were assigned as security to the First National Bank and Citizens National Bank of Waverly, as trustees for such banks and for such other banks or persons as might make loans to the Tioga County General Hospital. Subsequently the Citizens National Bank became the sole trustee by virtue of the closing of the First National Bank. In the interim the subscription card of the defendant had been delivered by the president of the First National Bank to the president of the Tioga County General Hospital, so that an action could be brought by the hospital thereon. The card so taken by the president of the plaintiff was subsequently delivered to the attorneys for the plaintiff herein. There were subsequently assignments and reassignments, which we consider of but little importance. Counsel for the defendant in urging this point with considerable vigor, lose sight of the fact that the assignment of the pledges to the trustee banks was not a general assignment, it was a delivery and assignment as collateral for the payments of obligations of the plaintiff. In the authorities relating to the effect of general assignments for the benefit of creditors, such as *Whiting* v. *Glass* (217 N. Y. 333) and *Foster* v. *Central Nat. Bank* (183 id. 379), the courts were dealing with what were, or what were in effect, general assignments.

The assignment of a chose in action, or of an interest therein as security for the payment of a debt, is a mere pledge and the assignor still retains an interest which he can assert in a suit. (*Mercantile Trust Co.* v. *Gimbernat*, 143 App. Div. 305; affd., 206 N. Y. 722; *Collins* v. *McWilliams*, 185 App. Div. 712, 716; *National Bank of Bay Ridge* v. *Albers*, 244 id. 127, 128, 129.)

One of the primary requisites is that the party bringing the action have such an interest that if a recovery be had the defendant will be protected from the assertion of further claims upon the same cause of action. Here there can be no doubt that if the plaintiff recovers in this action, the defendant will be fully protected from any effort on the part of any other party to recover upon the same subscription.

In accordance with the views hereinbefore expressed we hold:

*First.* That the defendant was not induced by misrepresentation to make the subscription on the 20th day of March, 1929, of $7,200 for the purpose of raising a construction and equipment fund for the Tioga County General Hospital.

*Second.* That there was consideration for the promises of the defendant to pay the sum of $7,200, which consideration was that the X-ray room constructed in the Tioga County General

Hospital should be dedicated as a memorial to his father, Charles W. Tidd; that the X-ray room was constructed and by the promisee was dedicated by the installation of a memorial plaque bearing the name of defendant's father, Charles W. Tidd.

*Third.* That the agreement by the defendant to pay the sum of $7,200 toward the construction and equipment of the Tioga County General Hospital is not void because of the Statute of Frauds; that there was a sufficient note or memorandum thereof represented by the subscription card and the indorsements thereon, together with the booklet, " Names that will Live," present at the time the agreement was made and the card signed.

*Fourth.* That the plaintiff has a sufficient interest in, and is in the possession of the obligation or pledge upon which the action is based, to maintain an action thereon, and is a real party in interest.

We direct a verdict in favor of the plaintiff for the sum of $7,200, with interest thereon as prayed for in the complaint, and d'rect the entry of judgment accordingly, with costs to be taxed by the clerk of the county of Tioga.