## SHEEHAN et al. v. MUNICIPAL LIGHT & POWER CO. et al.

### No. 293.

Circuit Court of Appeals, Second Circuit.

July 24, 1945.

---

Samuel Hershenstein, of New York City, for appellants.

Harold H. Corbin, of New York City, for appellees.

Before L. HAND, AUGUSTUS N. HAND, and CLARK, Circuit Judges.

L. HAND, Circuit Judge.

The plaintiff [1] appeals from a judgment dismissing her complaint upon the merits in a representative action brought on behalf of a corporate defendant which we shall call "Longacre," and of which she asserts that a second corporate defendant, which we shall call "Inter-City," held all the shares. The plaintiff claims as a shareholder in "Inter-City," and the action is one of the kind which has come to be known as "double derivative." It is based upon the premise that a judgment taken against "Longacre" in the District Court for the Southern District of New York in the winter of 1922 was void, or at least voidable, for reasons that will appear, and that with it the sale in execution which followed should be rescinded. The jurisdiction of the district court was ancillary; it depended upon a court's power to set aside its own judgment; it cannot depend upon diversity of citizenship, because the plaintiff is a resident of New York, as are the defendants: "Longacre," the Consolidated Edison Corporation, which we shall call "Edison," and the Manhattan-Bronx Power Corporation. The defendants "Inter-City," and a corporation, which we shall call "Municipal," are the only parties which are non-residents. The transactions which ended in the judgment sought to be vacated were complicated,

---

[1] The original plaintiff in this case, Minnie Sheehan, died before judgment entered, and her administrators revived the action. For convenience we shall continue to speak of her as though she remained the plaintiff.

68

and it will be necessary to describe them in some detail.

In the year 1887, the Common Council of the City of New York granted a franchise to use the city streets to lay electric conduits and wires; and this was later conveyed by several mesne transfers to "Longacre," which was incorporated in 1903. All of "Longacre's" shares were apparently owned by a corporation, which we shall call "Manhattan"; but for some reason, which the record does not disclose, the plaintiff's husband, John C. Sheehan, apparently had, or later acquired, a substantial interest in the franchise, and in 1912 she acquired from him as a gift her interest, as a shareholder in "Inter-City." Since 1903 when "Longacre" acquired the franchise, it had been trying to exploit it; but these efforts had always proved unsuccessful, and by 1912 it had piled up a deficit of about $342,000; in addition it had executed a mortgage on the franchise in the face value of $500,000. In spite of this discouraging record, in that year a banker named Fisk apparently seeing an opportunity of profit, entered into a contract with "Manhattan," in August of that year. In the transactions which followed Fisk was later succeeded by a banker named Leach; and the plaintiff insists, and we shall assume for argument, that by this succession Leach substituted himself for all purposes in place of Fisk. It will be clearer to disregard Fisk altogether, and speak as though Leach had been the only party concerned from the beginning. The contract provided that a new company should be incorporated, which turned out to be "Inter-City," and which was to execute a mortgage of $10,000,000, to be secured by the shares of "Longacre." It also provided for an issue by "Inter-City" of $3,500,000 of income bonds to be secured by $5,000,000 of the mortgage bonds just mentioned. Of the income bonds, "Manhattan" was to receive $1,500,000; Sheehan, $1,000,000; $850,000 were to be put in the hands of trustees; and Leach was to receive the balance, $150,000. The contract also provided for the issue of $10,000,000 of common shares to be put in a voting trust, the certificates of ownership to go: $2,000,000 to Sheehan, and $8,000,000 to Leach. Of the $850,000 of bonds the trustees were to reserve $500,000 to redeem, so far as possible, the mortgage bonds issued by "Longacre," and the balance were to refund "Longacre's" float-

ing indebtedness, which, as we have seen, was nearly $350,000. Leach promised to subscribe for $50,000 of the income bonds, and that "Inter-City" should "execute and deliver its agreement to purchase" $50,000 of such bonds upon the first of each of the months of January, February, March, May, July, and October, 1913. This promise was literally meaningless; a company which "purchased" its own bonds even though the proceeds were held by trustees to apply against its unfunded debts would merely pay those debts. The only meaning that can be assigned to the language is that "Inter-City" was to float $300,000 of its income bonds during the year 1913. "Inter-City" was similarly "from time to time" to "purchase" other income bonds— out of the $500,000 held to refund the "Longacre" bonds—and use the proceeds to pay the interest on the "Longacre" bonds. Finally, at any time within a year after "Inter-City" had redeemed, or paid, all the income bonds, it was to have an option to buy all the "Longacre" shares from "Manhattan" for $25,000.

This contract was in part at any rate carried out: that is, "Manhattan" received $1,500,000 of the income bonds; and Sheehan, $1,000,000. It does not however appear whether Leach got $150,000 of the bonds, whether any part of the $850,000 reserved for trustees was ever issued, or whether Leach ever took up his subscription of $50,000. "Longacre's" deficit continued steadily to increase: at the end of 1917, it was about $746,000. This had demanded financing meanwhile, which had been done by Leach upon "Longacre's" notes, the total of which in 1917 came to about $590,000. In that year the plaintiff— her husband had then died—turned in $740,000 of her income bonds for a like par value of preferred shares of "Inter-City," and Leach turned in his "Longacre" notes just mentioned for $852,900 in preferred shares. Whether, if he had received the $150,000 in bonds as provided in the contract of 1912, he turned these in as well, does not appear. The plaintiff asserts that he received $262,900 in preferred shares without consideration; but the judge found that there was no evidence to support this, and we have been unable to find any in the record. We shall return to this when we come to discuss the law. In 1920 "Manhattan" turned in its bonds—$1,500,000—for a like amount of preferred shares. The judge found that

all the income bonds had been redeemed for preferred shares in 1917; but—aside from the difference in the year just mentioned—we have been unable to find any evidence in the record of the fate of the $260,000 which Sheehan had received, and which the plaintiff did not turn in. In spite of this hiatus in the evidence, we shall assume with the plaintiff that, at least by 1920, all the income bonds had been retired, and that "Inter-City" had a year within which to take up its option on the "Longacre" shares by paying $25,000.

The deficit of "Longacre" continued to increase after 1917, and by the end of 1922 had become more than $1,223,000. This also required financing, and from 1917 forward this was by means of advances by "Municipal" which by November, 1922, had lent to "Longacre" more than $277,000, for which it took notes. "Municipal" was a New Jersey corporation, with 37,000 shares outstanding: of these Leach owned 25,525; his brother, 9250; Olmstead, a director in Leach's corporation, 2220; and the rest were held as qualifying shares. By 1922 Leach had become unwilling to advance any more money, and on November 4, of that year, he so told "Inter-City" through one, Lasher, who was at once secretary of "Municipal" and "Inter-City" and treasurer of "Longacre." That is to say, Lasher wrote a letter, so advising Durning, "Inter-City's" president, and managing clerk for the firm of lawyers who represented "Inter-City." On November 21, 1922, "Municipal" began the action against "Longacre" in the United States District Court for the Southern District of New York, which resulted in the judgment that it is the purpose of the present action to vacate. This was brought upon the notes—$277,000—which "Municipal" held, and jurisdiction depended upon the fact that "Municipal" and "Longacre" were corporations organized in different states—New Jersey and New York. The summons was served upon Lasher, as treasurer of "Longacre"; "Longacre" defaulted, and judgment was entered for the full amount on December 20, 1922. We may assume for argument that such a judgment, obtained by default, upon notice only to Lasher and Durning, would not have been valid as against any outside interest, such as the plaintiff's, if she had not been told and if there had been any defence to it.

The plaintiff did have notice that Leach would put up no money, and that he meant to proceed to enforce the notes which "Municipal" was holding. Durning identified copies of a number of letters produced from the files of his firm, all facsimiles, though addressed to various shareholders of "Inter-City," among them the plaintiff. These were dated December 5, 1922; advised the addressees that Leach would advance no more money; that an action on the notes had been begun; that judgment would end the value of "Longacre" shares—"Inter-City's" only asset—; and they called for a meeting on the 8th. There was sufficient evidence of the posting of these letters to satisfy § 695 of Title 28 U.S.C.A. Durning testified that each copy bore a mark which he recognized and which showed that, following the practice of his office, the original had been posted.[2] In further confirmation of this was the production of the original of one of the letters which had been returned because not delivered. One, Maher, an attorney in the firm which represented "Municipal" also testified that on November 21, 1922—the day that the action was brought—the plaintiff with her lawyer called upon him, and asked that the action might be delayed. In an effort to meet this the plaintiff was put upon the stand, but her testimony was wholly unavailing; she was very old and had no memory whatever of events twenty years before. Moreover, at least as early as 1924 she was fully advised that the assets of "Longacre" had been sold in execution of a judgment taken by "Municipal," for she procured an examination of Leach, preparatory to filing a complaint—never in fact filed—in which he so testified. Although the judge made no finding, we hold that the evidence established that the plaintiff knew of the pendency of the action and took no steps to prevent it.

These being the facts, the question arises whether there is any ground to vacate the judgment. The plaintiff first says that the court has no jurisdiction because the action was "collusive," by which

---

2 "The course of business was to have a carbon made of every letter that was sent out of the office. * * * That carbon was kept by the stenographer and then worked through to my desk as managing clerk and then sent to the files and filed in the regular course of business."

she means that "Municipal" was not the true party in interest. This argument is in two parts: that "Municipal" had parted with the notes; and that the real owner was Leach who was, it is assumed, a citizen of New York. Before the action was begun, "Municipal," at Leach's direction, had endorsed the notes in blank without recourse and pledged them to secure a loan from Doherty & Company, bankers. Doherty & Company redelivered the notes to "Municipal" before the action was brought, although the loan had not been repaid and although it was understood that the pledge should continue. It was certainly proper, and probably necessary, that "Municipal" should have possession of the notes in order to bring suit upon them; but the fact that they had been pledged and that the pledge was outstanding, was irrelevant. In New York as elsewhere, a pledgor may ordinarily sue upon a chose in action which has been pledged, Collins v. McWilliams, 185 App.Div. 712, 173 N.Y.S. 850; Frensdorf v. Stumpf, Sup., 30 N.Y.S.2d 211, 217; Tioga County General Hospital v. Tidd, 164 Misc. 273, 298 N.Y.S. 460. Notes—when the pledgor has possession—are not an exception. National Bank of Bay Ridge v. Albers, 244 App. Div. 127, 278 N.Y.S. 381.

The objection that "Municipal" was not the real party in interest rests only upon the fact that Leach and his associates owned all the shares, and used the corporation as a means of doing their private business. Nearly all corporations are organized for such a purpose; and there is not the least reason to suspect that "Municipal" was a "sham," organized solely to gain access to a federal court. Lehigh Mining & Manufacturing Co. v. Kelly, 160 U.S. 327, 16 S.Ct. 307, 40 L.Ed. 444; Miller & Lux v. East Side Canal Co., 211 U.S. 293, 29 S.Ct. 111, 53 L.Ed. 189; Southern Realty Investment Co. v. Walker, 211 U.S. 603, 29 S.Ct. 211, 53 L.Ed. 346. Indeed, it had been organized at least five years earlier, before any of the notes were issued. Moreover, if Black & White Taxi Co. v. Brown & Yellow Taxi Co., 276 U.S. 518, 48 S.Ct. 404, 72 L.Ed. 681, 57 A.L.R. 426, is still law, it would make no difference that it had been organized only for that purpose. See Scavenger Service Corp. v. Courtney, 7 Cir., 85 F.2d 825, 832. Nor was there the least evidence that the notes were originally taken by "Municipal," or were be-

ing held by it, with the intention of transferring them to Leach and the other shareholders. If the plaintiff is right, it is an answer to any action by a corporation in a federal court that the shareholders could not personally sue in that court. Perhaps that should be the law, but clearly it is not.

Since the action was properly in the district court the only question is whether the plaintiff—disregarding for the moment her delay and any estoppel—has shown any grounds for vacating it. Let us for argument go even so far as to concede that the common control by Leach of "Longacre" and "Municipal" could be treated as a "fraud" in the sense that "fraud" is a basis for vacating a judgment. Nevertheless, the plaintiff had to show that there was some defence to the notes, since otherwise "Longacre" suffered nothing by the judgment. She advances three putative defences. First, she says that when Leach in 1917 took more than the number of preferred shares in "Inter-City" to which he was entitled, in exchange for the notes which he transferred to that company, a claim against him arose equal in amount to the par of the extra shares, a claim which, had "Inter-City" pressed it against him, would have made him withdraw the action. Second, she says that Leach had agreed to finance "Longacre," and that his failure to do so constituted a valid counterclaim against "Municipal's" notes, on which the action was founded. Third, she says that, since "Inter-City" was the assignee of $590,000 of notes given for Leach's advances before 1917, when "Municipal" bought in the "Longacre" shares, and took them over in its own interest, it excluded "Inter-City" from a rightful interest in the shares, and must be held to have become a constructive trustee. We are not sure that the plaintiff makes the third point as we have stated it; frankly, the legal significance of what she does say about the "Longacre" notes held by "Inter-City," we find it difficult to understand. Be that as it may, we put the claim in what is certainly its most plausible form.

As we have said, the judge found that there was no evidence that Leach took more preferred shares in "Inter-City" than he was entitled to; and there was none. It is true, as has appeared, that the par of the notes which he transferred was less than that of the shares, although the dis-

crepancy is reduced by more than one half, if we assume that he ever received the $150,000 of income bonds and turned them in. But it would make no difference if he did take more shares than he should have. True, being in control of "Inter-City" to do so would have been a wrong to that company, for which it would have redress. Pollitz v. Wabash R. R. Co., 207 N.Y. 113, 100 N.E. 721; Weniger v. Success Mining Co., 8 Cir., 227 F. 548. That wrong, so far as concerns the corporation as distinct from the shareholders, would have consisted in depriving it of the opportunity to issue the shares wrongfully taken; conceivably the corporation might itself also sue upon the wrong done the other shareholders by reducing the value of their shares—at least, we will assume so. But both these wrongs would be measured by the actual damage done; and that in turn would depend upon the value of the corporate assets which stood behind the shares. There is nothing to show that, cumbered as they were with $500,000 of bonds and about $600,000 of notes, the preferred shares in 1917 had any appreciable value; at any rate, it is clear that the value of any claim against Leach was to the last degree speculative. There is moreover no evidence that Leach ever promised to pay par for the shares. However, let us suppose that "Inter-City" had some such claim, on what conceivable theory could it be relevant in vacating the judgment? It would not be a valid counterclaim; it is not indeed suggested that it would. The only theory is that, had Durning as president of "Inter-City" pressed Leach, he would have withdrawn the action. What reason is there so to suppose? It is certainly quite as likely, indeed more likely, that to assert the claim would only have spurred Leach to make sure of the only asset which lay behind "Inter-City's" own shares—the "Longacre" shares themselves.

■ Next, is the suggestion that Leach had agreed to finance "Inter-City," and as we understand it, that this was an equitable counterclaim against "Municipal," or at least, like the defence just considered, that to assert it would have caused a withdrawal of the action on the notes. The basis for this claim is that provision in the contract of 1912 by which Leach agreed to subscribe to $50,000 of bonds, and that "Inter-City" should float $300,000 more during 1913. The second of these promises

was quite different from the first: to promise to subscribe for bonds is one thing; to promise that the new company shall float bonds is quite another. The very fact that the two promises were cast in such different language presupposes a difference in purpose, and an intent upon Leach's part to be liable only for $50,000. The only damages recoverable upon the second promise, even if we were to take it as a guarantee, would be those which followed upon "Inter-City's" own inability to float $300,000 of bonds, if it had tried to do so: damages which were not proved and could not have been. However, it would make no difference, if we treated Leach as liable for the whole $350,000. So far as the plaintiff means that the assertion of such a claim against him would have caused him to withdraw "Municipal's" action on the notes, the answer is the same as that just given to the supposititious claim arising out of the issue of preferred shares. So far as she means that the claim was an equitable counterclaim on the theory that "Municipal" was only Leach in disguise, there are two answers. "Municipal," upon this record was not a disguise for Leach; he held a great majority of its shares, it is true, but that would not have been enough for a counterclaim, even in equity. Although "Inter-City" could have taken judgment against Leach, it could have recouped any loss which it suffered in the "Longacre" shares, only by seizing on execution Leach's shares in "Municipal." There would have been no defence to "Municipal's" action on the notes; which is all with which at the moment we are concerned.

■ However, there is another and more fundamental answer: "Inter-City" could have recovered no damages for the breach. Although Leach had defaulted upon his promise to subscribe for $350,000 of income bonds, nevertheless he had advanced to "Longacre" $590,000 upon its notes. Clearly there is no ground to suppose that he would have done this, if he had taken up the bonds. True, the proceeds of the bonds would have been earmarked for "Longacre"; the trustees would have been bound to use them to pay its floating debts, and that would have relieved the "Longacre" shares. On the other hand, "Inter-City's" indebtedness would have been increased pro tanto; and, since the "Longacre" shares were "Inter-City's" only asset, every debt of "Inter-

City" would have to be paid out of those shares before "Inter-City" could itself receive anything out of them. Thus, the only persons who could be prejudiced by the fact that Leach took "Longacre" notes instead of "Inter-City" bonds would be other creditors of "Longacre" and the income bondholders of "Inter-City" itself. The first might complain because, "Longacre's" only asset: i. e. the franchise, should not have been burdened to the extent of $350,000; the second might complain because to the same extent Leach had obtained a preferred claim on the franchise. "Inter-City" could not vicariously assert either of these claims; and in 1917, when the "Longacre" bonds were redeemed, it could have recovered no damages upon the breach of Leach's supposed promise. Nor did it succeed to any claim which the bondholders may have had, when they turned in their bonds in exchange for preferred shares. That exchange was a surrender of any such claim; and there is not the proverbial scintilla of evidence that they did not know what they were then doing, or how to justify them, as preferred shareholders, in attempting to rescind that surrender.

■ The third supposed defence has more substance. After "Municipal" took the judgment here sought to be vacated, it procured the appointment of a receiver of "Longacre" in proceedings supplementary to execution, who finally sold the franchise for $25,000. A nominee of "Municipal" bought it in and eventually it was conveyed to the Manhattan-Bronx Corporation, also controlled by Leach. There was no insolvency proceeding, no effort to bring into hotch-pot the other creditor of "Longacre": i. e. "Inter-City" with its $590,000 in notes. That omission would have been unobjectionable, had "Inter-City" been independently controlled; for in that case, if "Inter-City" had wished to assert its interest in the franchise as a creditor of "Longacre," it would then have been obliged to act for itself. However, "Inter-City" was under the control of Leach, though not as completely as "Municipal," and it is certainly, at the very worst, a most plausible position that it was an abuse of Leach's power not to assert on "Inter-City's" behalf that interest in the franchise to which its notes entitled it. Furthermore, if that be true, "Inter-City" would have been in position to follow the franchise into the hands of any nominee of

Leach as a constructive trustee. But there are fatal objections to the assertion of any such claim in the present action. First, as we said at the beginning, the district court had jurisdiction over it only as ancillary to the original action upon the notes; as an independent action, based upon diversity of citizenship it cannot stand. The existence of the other notes and the relations of Leach to "Inter-City" were wholly irrelevant to the action at bar, so far as it sought to vacate the judgment; these constituted no defence to a judgment on the notes held by "Municipal." Even though "Inter-City" had instituted an insolvency proceeding, "Municipal" could have obtained an order adjudicating the validity of its notes, and that would have been equivalent to a judgment. It was not that judgment which wronged "Inter-City," but the exclusion of "Inter-City" from its proper share in the assets. Hence the supposed claim, even though valid, was not justiciable in the action at bar.

■ There is a conceivable answer to this argument, although the plaintiff has not made it. It might be asserted that, although the district court would not have had jurisdiction over an action based upon diversity of citizenship to impress a constructive trust upon the franchise, nevertheless it might under the doctrine of Hurn v. Oursler, 289 U.S. 238, 53 S.Ct. 586, 589, 77 L.Ed. 1148, have jurisdiction over such an action, if it were an alternative to an action to vacate the judgment. That doctrine, it will be remembered, is that a claim over which a district court has no independent jurisdiction may be so closely woven into another claim over which it has, that in spite of the defeat of the second claim on the merits, the court may determine the first. In the words of that case: there may be, not two "causes of action," but two "grounds" for a single "cause of action." We need not say whether in the case at bar the two claims were in fact so bound together as to be only two "grounds" for the same "cause of action." The doctrine has not proved to be wholly free from obscurity, and we are not too certain of its precise boundaries. Nor are we forced to decide the question, because, even though the district court did have alternative jurisdiction over the claim to impress a constructive trust upon the franchise, that claim had been long since barred by the statute of limitations of New York. Guaranty Trust Company v.

York, 65 S.Ct. 1464. The bar of the statute must surely be as effective against the claim when the courts' jurisdiction depends upon its close intertwining with a second claim, as when it depends upon diversity of citizenship. We do not mean to say that the New York statute was not also a bar to the action so far as it was confined to vacating the federal judgment itself. The plaintiff seeks to distinguish that claim from a claim which can be prosecuted in the state court, for the reason that she could proceed only in the federal court. We have recently held that the state statute bars even a claim arising under a federal statute, if it can be prosecuted in either a state or a federal court. Holmberg v. Ambrecht, 2 Cir., 150 F.2d 829. We do not now decide that, even assuming that the claim to vacate the judgment in the action of "Municipal" v. "Longacre" could have been prosecuted only in a federal court, it was not subject to the state statute; that question we can, and do, leave open, because, for the reasons given, the plaintiff has failed to prove that claim upon the merits. Thus, there were no valid defences to the original action and the complaint was rightly dismissed.

There was added justification for doing so. So far as the claim is merely to vacate the judgment, it has already appeared that the plaintiff was fully advised of the action upon the notes, and made no move to intervene. By allowing Leach to proceed to judgment and sell in execution she estopped herself from objecting, as the judge found. Whether the same information and inaction also estopped her as to the claim so far as it sought to impress a constructive trust upon the franchise, there may be doubt, but even though these did not estop her, the abandonment in 1924 of her attempt to press her claim against "Edison" estops her as to it. "Edison" had then bought the franchise, and in the fifteen years which followed the abandonment before this action was filed, witnesses have died, memories have lapsed and "Edison" was permitted to exploit the franchises for a number of years in reliance upon the validity of its purchase. Quite aside from the bar of the statute, these circumstances forbid the suit in a court of equity.

In what we have said we have been assuming that "Inter-City" was the owner of the "Longacre" shares; and we think

that that was true, in spite of the fact that it is impossible to put one's finger upon the transaction by which they passed to it from "Manhattan." The plaintiff's argument is that, when Durning purchased a judgment against "Manhattan" for $17,000, which had been entered in 1916, it was the equivalent of a payment of $25,000, the option price. There are insuperable objections to this. The option had to be exercised within a year after the last income bond had been redeemed, which at the latest was 1920. If we figure five, or even six years, interest upon the judgment purchased, the amount is short of $25,000 by a considerable amount. Moreover, although it is probable that Durning bought the judgment for "Inter-City," it is a mere assumption that he intended to use it as a tender of the stipulated sum. It was far from enough in 1917 and there is not the slightest reason to suppose that the redemption of the bonds, begun in 1917, was expected to drag on to 1920. Nevertheless, it seems to us unbelievable that the parties did not act upon the tacit understanding that after the redemption of the income bonds, the "Longacre" shares passed to "Inter-City." They had been pledged to secure "Inter-City's" mortgage bonds which, though never issued, were pledged in part to secure the income bonds. That meant that the shares were in effect pledged to secure the income bonds. If the redemption of the bonds released the shares so that they reverted to "Manhattan," as pledgor, the transaction stripped "Inter-City" of all assets whatever. Of course the bondholders did not mean to put themselves in that position, when they exchanged their bonds for preferred shares. Plainly Durning understood that the "Longacre" shares were the property of "Inter-City," when he wrote the letters to the plaintiff and the other shareholders on December 5, 1922.

Finally, we think that, so far as concerns "Edison," the plaintiff failed to prove that, when it took the franchise from the Manhattan-Bronx Corporation's assignee—one, Gray—it was charged with notice of any circumstances which made the Manhattan-Bronx Corporation a constructive trustee—assuming that in fact it was a constructive trustee. From what we have already said, it has appeared that there was only one thing which could have so charged it: knowledge, or notice, that "Inter-City" held notes of "Longacre"

which had been excluded from any interest in the franchise, and that Leach controlled both "Longacre" and "Inter-City." All the other facts surrounding the judgment and execution under the judgment did not show any abuse of fiduciary obligation on anyone's part. All had been entirely lawful. "Edison" bought the franchise in April, 1924, and at least until July, 1923, "Edison" and Leach were by no means acting in concert as to the "Longacre" franchise, for "Edison" tried to defeat the application of the Manhattan-Bronx Corporation before the Public Service Commission for leave to exploit it. It is doubtful that up to that time at any rate "Edison" could have been enough in Leach's confidence to learn of the existence of the assigned notes. At any rate nothing of the sort was proved, nor was it proved that "Edison" learned of them between then and the following April. Beardsly on "Edison's" behalf did go over the papers in the judgment roll of the action of "Municipal" v. "Longacre"; but these told nothing of the other notes, or of any other claims against "Longacre." It is true that "Edison" had already disclosed a desire to secure the franchise; it had bought all the "Longacre" bonds; it had discussed its purchase with Leach; and eventually it paid about $600,000 for it; but none of these things will support the necessary inference, which must rest only upon vague, unbased suspicion. We agree with the judge that "Edison" was a bona fide purchaser as it claims to have been.

Judgment affirmed.