**SCAVENGER SERVICE CORPORATION v. COURTNEY et al.**

No. 5768.

Circuit Court of Appeals, Seventh Circuit.

July 17, 1936.

As Amended on Denial of Rehearing Oct. 1, 1936.

Joseph A. Struett, of Chicago, Ill., for appellant.

Thomas J. Courtney, Jacob Shamberg, William P. Kearney, Harry S. Ditchburne, Charles E. Lounsbury, Nicholas J. Bohling, and Harold J. Ross, all of Chicago, Ill., for appellees.

Before EVANS and SPARKS, Circuit Judges, and BALTZELL, District Judge.

EVANS, Circuit Judge.

This appeal is from a decree dismissing, for want of equity, appellant's bill for injunction and for other relief against appellees. The District Court made findings of fact and conclusions of law (summarized in the margin[1]) finding no evidence to support appellant's charge that

---

[1] The District Court's findings in substance are:

(1) Local 731 was made up largely of members of Chicago Teamsters union (not A. F. L.) which was the only union in existence prior to May, 1933, furnishing men for scavenger business.

(2) State's Attorney became convinced the Chicago Teamsters was a union controlled by hoodlums and his action was upheld in Keegan v. Courtney, 279 Ill.App. 629.

(3) No showing that the State's Attorney did any act detrimental to appellant, nor engaged in conspiracy against appellant.

(4) Dennis J. Finn decided to go into excavating business and hired Brookbank to carry out his contracts, Feb. 1, 1934. Finn organized the Scavenger Corporation, and employed members of the Chicago Teamsters union.

(5) Appellee union officials honestly believed Finn was connected with one "Studdy" Looney who sought destruction of appellee union and the court found Finn was in alliance with groups interested in destruction of appellee union.

(6) Appellant's customers were notified their buildings would be, and were, peacefully picketed because appellant did not employ members of appellee union. No

a conspiracy existed between appellees (a scavenger association, the local of an A. F. L. union, the State's Attorney, and his chief investigator) to hinder and prevent

violence occurred. Picketing was justified and not done pursuant to an agreement with appellee association.

(7) No conspiracy between any of appellees.

(8) Allegations of complaint re conspiracy not sustained by evidence.

(9) Appellee association did not limit its membership to members of appellee's union.

(10) No evidence to sustain allegation that agreement that appellee union was not to furnish members to independent scavengers unless approved by the association or the State's Attorney.

(11) No evidence that appellee union refused to accept as members employees of independent scavengers so that the association would not be forced to meet competition.

(12) No evidence of agreement that State's Attorney should not investigate appellees' activities or prosecute them, but should encourage and approve them.

(13) No evidence of agreement that State's Attorney was to falsely inform inquirers that independent scavengers (particularly appellant) were employing men who were associated with gangsters.

(14) No evidence that appellee association and appellee union refused to permit anyone to engage in scavenger business unless approved by them or State's Attorney.

(15) No evidence to support charge that Courtney or Gilbert used police to protect pickets or further conspiracy.

Court's Conclusions of Law.

(1) No conspiracy has been proven.

(2) Appellant failed to prove an equitable cause of action.

(3) The suit should be dismissed for want of equity and the appellant is not entitled to any relief and the costs should be taxed against it.

After an extended hearing the Special Master filed a detailed report (25 pages long) in which he found:

(1) The attack on jurisdictional amount could not stand because the value of the business sought to be preserved is the measure, and in this case it was in excess of $3,000.

(2) Purpose of reincorporation was to gain diversity of citizenship.

(3) Not sufficient evidence of conspiracy as to certain members as individuals, who were directors of appellee association.

(4) The appellee union was affiliated with A. F. L. and was composed in a large part of members of the Chicago Teamsters union (not affiliated with A. F. L.) which Courtney and Gilbert sought to disband. Stroeble was president of appellee union until June, 1934, when expelled for dishonesty.

(5) Acts of Monahan, Rogers, Boss and Bohlman were known by and ratified by the appellee union.

(6) Prior to May, 1933, the only union furnishing men for scavenger business was the Chicago Teamsters. It attempted to dictate to employers terms of employment and they went to Courtney and Gilbert for protection and they intervened to protect public peace. Prior to 1917 Gilbert was business agent for the Chicago Teamsters.

(7) Courtney was convinced the Chicago Teamsters was run by gangsters and decided to eliminate such dominance and sought to have members of the union quit and join the new A. F. L. union local.

(8) Ill.App. court case, and this record, show there was trouble between Chicago Teamsters union and police and State's Attorney in May and June, 1933. State's Attorney advised men to quit Chicago Teamsters, and employers to employ only appellee union men.

(9) Courtney and Gilbert were actuated by the best motives. Their acts in this case were not within the scope of their duties (contrary to holding of Ill.App. case).

(10) Evidence is not sufficient to prove Courtney was in conspiracy against appellant.

(11) Finn permitted employees to transfer affiliation. Not enough excavating business early in 1934 so he decided to go into scavenger business. He obtained contracts for such service from owners of buildings, including Walgreen, at reduced prices. He notified appellee union, and it agreed to furnish helpers.

(12) Stroeble called on Finn in Jan., 1934, and said appellee union would not furnish him men for scavenger work because of union's promise which had made trouble with appellee association and the latter objected to Finn having men and if he attempted to use appellee union men they would tie up his excavating business.

(13) " * * * It is conceded that the union advised the association of Finn's request for men. The occasion for Johnson and Hess (assn. officials) being in conference with Finn, Stroeble and Boss (union officials) was the receipt by Johnson and Hess of this information and they were present to keep Finn out of the scavenger business. I find that in substance Johnson and Hess told Finn * * * that there was a community of interest between the appellee union and the appellee association; that there was an un-

appellant from carrying on a scavenger business in Chicago.

The District Court referred the hearing of the cause to a special master who con-

derstanding between them as to who was to be furnished with union men in the scavenger business, and that a wage agreement existing between the union and the association prohibited the union from furnishing Finn men."

(14) Community of interest between appellee union and association clearly established by uncontradicted evidence showing some 88 members of union were also members of the association and so union activities were not solely for union.

(15) "At the time of the meeting with Finn, a conspiracy existed between the defendant union and the defendant association and their respective officials to keep Finn and his companies and agents out of the scavenger business. I further find that the overt acts as specifically found in the Report which took place pursuant to such conspiracy have resulted in irreparable injury to the plaintiff and its predecessor company."

(16) Appellee association's chief object was to stop price retrogression of scavenger service. If Finn were successful there was possibility that 50 other excavating companies would go into scavenger business.

(17) "He (Johnson) * * * (told) union officials present * * * that he did not think that they had any right to supply Finn with men to go into the scavenger business since he had never been in it before. Stroeble * * * agreed with him that Finn should not be furnished union men. * * * This agreement was confirmed by a formal resolution of the defendant union to the effect that neither Finn nor his companies were to be permitted to use members of the defendant union in the scavenger business. * * * *" "Finn was advised by Rogers that if he attempted to use excavating men in the scavenger business that all of his excavating trucks would be 'tied up and he would be viced' from other work he was then doing * * * and he would get no men from the defendant union for the scavenger business."

(18) Finn then got Brookbank to buy two trucks to fulfil Finn's scavenger contracts with Walgreen. Brookbank told defendant union he was working for Finn and asked for men and they refused and so he hired members of the Chicago Teamsters union. They were paid union wages.

(19) Finn serviced about 100 properties for Glatt and Price at a ten per cent reduction from what defendant association members had done.

(20) Claim that Finn and Brookbank connected with Looney was not true and since Finn still used some of defendant's union men, the claim is not asserted in good faith.

(21) Monahan succeeded Stroeble as pres. of defendant union. He called Glatt & Price and said Finn was not a member of the union. and not using A. F. L. men and told them to call State's Attorney to verify and he did and was told its buildings would be picketed, which was done and this caused stopping of deliveries to building, causing Glatt and Price to go back to old scavengers.

(22) Stroeble said pickets paid with money of association but Stroeble is not very credible, but union books show no expenditures for pickets.

(23) In May, 1934, Finn contracted with one Pfordresser at 20% cut rate. Monahan and Bohlman called on Pfordresser telling him Finn was not employing union men. Assistant State's Attorney called Pfordresser and told him the plaintiff was operated by persons of little responsibility and of poor character. Master said State's Attorney or Gilbert were not liable for assistant's acts. Picketing and cancellation of Finn's scavenger contract followed.

(24) Boberg, member of assn., serviced Barry apartments. Finn was then given contract. Boberg told owner that Finn did not employ union men and trouble would follow because Finn was not member of association and building would be picketed, and it was and so owner cancelled contract and gave it back to Boberg. At 3500 Lake Shore Building, Finn succeeded Boberg when latter refused to lower rates. Finn still has the building. Bohlman and Monahan went to see manager of building.

(25) Same as (24) happened to building at Arlington and Clark.

(26) When Finn complained to Gilbert about picketing Gilbert protested to defendant union to furnish men but his requests were denied. Defendant union told Gilbert that A. F. L. union would be broken up if Finn were furnished men and Gilbert believed it and didn't arrest the pickets.

(27) Finn complained to N. R. A. and officials investigated and called meeting July 7, 1934, of Finn, defendant union officials, Gilbert, and agreement was reached whereby defendant union officials, Monahan and Rogers agreed to furnish Finn men for scavenger business and not to interfere in Finn's business. Master did not believe union officials who said that they did not know what they were signing. Two days later Monahan and Rogers and Johnson and Grayson (assn. officials) and

cluded that a conspiracy *existed* between all appellees except Courtney whereby the union refused to furnish appellant with men because of appellant's price cutting

their attorney called on N. R. A. investigator and said they could not carry out agreement because contrary to agreement between defendant assn. and union not to furnish independent contractors.

(28) Assn. of Commerce official called Gilbert on behalf of Finn to remove pickets from a building and was told by Gilbert that Finn was a racketeer and that racketeers were being driven out of business, and asked how the Assn. of Commerce took his membership. "The evidence discloses no basis for Gilbert's statement that Finn was a racketeer, but on the contrary proves that Finn was and is a business man of good standing attempting to engage in a lawful business in a lawful manner."

(29) "The defendant Johnson told the union officials that if Finn were given men, the assn. would be forced to break its wage agreement with the union. From all the testimony, I find that this threat on the part of the defendant assn. was a coercive force which effectively kept the union from furnishing Finn or his companies with union men and from abandoning the conspiracy. * * * On July 9, 1934, Boss called Finn and told him that a meeting had been held between the union and the defendant assn. and that the assn. by threatening to break the wage agreement * * * had compelled the union to rescind the agreement of July 7, 1934."

(30) Finn went to see Gilbert. He said nothing could be done until conference with Goudie, Member of International Union Counsel.

(31) No physical violence in connection with picketing and would be "peaceful picketing" if in bona fide labor dispute. Representations made by defendants that a trade dispute existed were false. The refusal of men, followed by picketing is part of the conspiracy and designed to protect members of the defendant assn. from fair competition on a basis of price.

(32) At N. R. A. meeting Gilbert conceded that he was satisfied that hoodlum charge against Finn was not true, but he thereafter participated in the overt acts which caused the master to conclude that Gilbert became a party to the conspiracy as shown by the evidence.

Master's Conclusions of Law.

(1) Scavenger contracts are not personal contracts and are assignable.

(2) Claim for damages by appellant's predecessor was assignable to it for appellees' wrongfully inducing breach of contracts with appellant.

(3) Claim for libel and slander not assignable.

(4) Fact that assignor could not have sued because no diversity held no bar to appellant's suit, where diversity exists, because this is a tort claim.

(5) The claim for damages due to the assignor cannot be joined with the equitable suit of appellant because the damages accrued before appellant came into existence. But the claim for damages due appellant for injury to its business is cognizable in this cause in equity.

(6) Appellant's incorporation in Delaware to create diversity of citizenship does not deprive the Federal court of jurisdiction.

(7) The right to do business will be protected by equity against unfair competition. The picketing, slandering, and boycotting constituted unlawful injury to appellant. The damages from the conspiracy being irreparable, injunctive relief is proper.

(8) Acts although giving rise to action for slander, may be restrained by injunction against members of conspiracy of which the acts are in furtherance. The court will not grant injunctive relief against Courtney or Gilbert re the picketing, etc. because equity will not interfere with official duties.

(9) In Illinois the fixing of prices is against public policy which encourages an open market.

(10) Immunity of public official for participation in conspiracy (by Gilbert) does not exist where acts are outside scope of office, and Gilbert's acts were clearly outside the scope of his duties. His good motive will not excuse liability.

(11) Not purpose of Norris-LaGuardia Act to limit equity in preventing illegal interference with business not justified by a legitimate trade union motive. Facts in this case do not fall within Act.

(12) The picketing was not lawful because with fraudulent intent, and not in course of labor dispute.

(13) Rogers, Monahan, Boss, Bohlman, Hess, Johnson, Grayson, Gilbert and Boberg were members of a conspiracy to injure appellant and such conspiracy was within the power of the equity court to enjoin.

(14) The master then went on to make requisite findings in case the Norris-La Guardia Act be held to be applicable.

(15) Recommended the dismissal of the bill against Courtney, Braeckman, Venema, Criel, Grott, Wendel, Wischmeyer, Larson, Teune, and Marks; that an injunction issue against the others; damages to appellant of $1,000; the bill as to damages to appellant's predecessor should be dismissed without prejudice to an action at law.

practices, which it believed would hurt the members of the scavenger association to such an extent that they would be unable to continue the wage agreement with the union; that the picketing of buildings serviced by appellant was not peaceful picketing within the terms of the Norris-La Guardia Act (29 U.S.C.A. §§ 101–115); and that Capt. Gilbert informed building managers, who inquired of him, that appellant was connected with hoodlums.

Appellant is a Delaware corporation formed for the purpose of creating diversity of citizenship so as to maintain this suit. Its predecessor was a corporation formed in Illinois by one Dennis Finn who was in the excavating business but had idle trucks which he decided to use in the scavenger business. He had instituted suit in the state court on substantially the same charges as in the instant suit, but upon the incorporation of appellant and the bringing of the instant suit the state suit was dismissed without prejudice.

The decisive issue is whether a conspiracy existed among the appellees to destroy appellant's business. In view of the fact that the master found such a conspiracy to exist, and the District Court found the contrary, we have read with great care the entire transcript and the exhibits introduced.

The conflict and contradictions in the evidence are absolute and unsolvable. Someone has falsified.

Out of all the testimony the following conclusions may safely be announced as having the weight of the testimony to support them:

(1) Finn, originally in the excavating business, decided to make use of idle trucks and use them in the scavenger business. This was in January, 1934.

(2) Union officials had unemployed members whom they desired Finn to hire out but whom he did not employ, when he first started.

(3) Finn used some scavenger workers, members of the Chicago Teamsters local, a scavenger workers' union, the majority of whose members left the local and formed the new local, No. 731 (an appellee) affiliated with the A. F. of L.

(4) "Studdy" Looney, an alleged gangster, had some connection with the old union—probably collecting dues. Appellees insisted the reason they would not furnish Finn with men was that he was connected with Looney and other gangsters, through the union, and that one Brookbank whose trucks Finn used, got the trucks from one Munizzio who was in partnership with Looney. Finn said he was not in any way connected with Looney.

(5) Finn asked Local 731 for men and requested that his Chicago Teamster men be permitted to join Local 731. Both requests were refused.

(6) Finn cut rates for scavenger services (but probably maintained union scale of wage). This was without doubt a prime source of trouble with the association.

(7) A meeting was had at the N. R. A. office in July, 1934, where members of the union signed an agreement to furnish Finn men. This agreement was immediately repudiated by the union on various grounds —that they thought they were signing not an agreement but minutes of the meeting, and that it was never approved by the International union counsel.

(8) Pickets were placed by the union on buildings serviced by Finn, thereby effecting the stoppage of all A. F. L. union deliveries including milk and caused the cancelling of Finn's contract by the building owners or managers. There was evidence that there was no other cause for the cancellation of such contracts except the picketing.

(9) The pickets were paid, ostensibly by cash from the union's cash funds. Union officials vehemently deny the association paid for or ordered the picketing. The union's bookkeeping was very casual and did not rise to the dignity of evidentiary records—a cash fund was maintained and evidently no record kept of its income or disbursement. There was some evidence of union officials' calling on the association for funds for reimbursement.

(10) Association officials insist they have no agreement forbidding the union from furnishing men to independent scavengers who are not members of the association and cite instances.

(11) There is little evidence of Courtney's actual participation, but much more of his chief investigator, Capt. Gilbert. The latter consulted with both union and Finn and association men. Gilbert had formerly belonged to Chicago Teamsters.

Any of the following reasons may have been the source of the enmity which the appellees undoubtedly bore against appellant:

(1) The belief that appellant was in some way connected with gangsters; (2) It was openly operating the scavenger business at a cut rate and was successfully depriving members of the association of contracts for servicing buildings; (3) It was using members of the old Chicago Teamsters Union, not affiliated with the A. F. of L.; (4) It had originally refused, or at least failed, to use unemployed members of the A. F. of L. Local.

The law questions presented are: (1) What force has a master's finding of the existence of a conspiracy when overruled by the District Court's finding? Did a conspiracy in fact exist? If so, as to what parties? (2) Is the court deprived of jurisdiction because the appellant reincorporated in Delaware so as to have a diversity of citizenship basis for Federal court jurisdiction? (3) Do the facts of the case bring it within the Norris-La Guardia Act so that the District Court is without power to issue an injunction? (4) When may a public officer be deemed to have participated in a private conspiracy as distinguished from acting as a public officer?

Rule 61½ of the Equity Rules of the Supreme Court, promulgated May 31, 1932 (28 U.S.C.A. following section 723) defines the weight to be given to a master's finding. It provides

"In all references to a master, either compulsorily by the court in cases where it has the power to make a compulsory reference, or by consent of parties where consent is necessary, whether the reference be of all issues of law and fact, or only particular issues either of law or fact or both, the report of the master shall be treated as presumptively correct, but shall be subject to review by the court, and the court may adopt the same, or may modify or reject the same in whole or in part when the court in the exercise of its judgment is fully satisfied that error has been committed: Provided, That when a case or any issue is referred by consent and the intention is plainly expressed in the consent order that the submission is to the master as an arbitrator, the court may review the same only in accordance with the principles governing a review of an award and decision by an arbitrator."

In Uihlein v. General Electric Co., 47 F.(2d) 997, we collected the authorities that bore upon the binding efficacy of findings.

Both appellant and appellees filed numerous exceptions to the master's findings and conclusions. The District Court ruled upon these exceptions, allowing some and overruling others. He agreed with the master that Courtney was not involved in the instant controversy, and had no knowledge of his subordinate's action. As to Gilbert, the court was of the belief that he was not in the conspiracy whereas the master held Gilbert was in the conspiracy after the N. R. A. meeting, but not before.

As to picketing, the court concluded it was peaceable, there being no violence. The court pointed out that if the picketing were unlawful Finn could have complained in the state courts, which he did not even try to do; and if the union believed it had a grievance against appellant it had a lawful right to picket. The court concluded that the picketing was *bona fide* because the union entertained the belief in the beginning that Finn was not going to employ Local 731 men, and was in alliance with groups opposed to the A. F. L. union, and that the picketing was not unlawful and therefore should not be enjoined. The court also stated that if there were an agreement between the association and the union to keep others from engaging in the scavenger business, such agreement would be unlawful. If the union at the termination of the litigation refused to furnish appellant men, it could not lawfully attempt to interfere with its business.

Equity Rule 61½ provides that the master's report shall be treated as presumptively correct and the court may reject the same when in the exercise of its best judgment it is *fully* satisfied error has been committed. Roosevelt v. Missouri State Life Ins. Co. (C.C.A.) 70 F.(2d) 939; Cases decided before promulgation of rule 61½: Kimberly v. Arms, 129 U.S. 512, 9 S.Ct. 355, 32 L.Ed. 764; Davis v. Schwartz, 155 U.S. 631, 15 S.Ct. 237, 39 L.Ed. 289; Tilghman v. Proctor, 125 U. S. 136, 8 S.Ct. 894, 31 L.Ed. 664; Callaghan v. Myers, 128 U.S. 617, 9 S.Ct. 177, 32 L.Ed. 547.

The District Court was of the opinion the master erred in his conclusions of law and findings of fact.

The court's adverse conclusion is entitled to great weight on this review. He decided no conspiracy against appellant existed among any of the appellees. Whether or not a conspiracy existed is one of the basic questions confronting us.

In this instance where the testimony on the two sides is in such sharp and utter contradiction, the decisive factor is the relative credence to be given the opposing witnesses. No better instance can be conceived for the application of the rule that a reviewing court will not disturb the finding of the trier who saw and heard the witnesses. For instance, the District Court said, "The witness Stroeble, I do not consider a credible witness and have given little weight to his testimony." Stroeble was president of the appellee union when appellant first went into business. He was later removed for embezzlement. The master also gave little credence to Stroeble's testimony but on two points at least based findings of fact upon his testimony because he found corroboration in documentary exhibits. The court observed that on reading the evidence he found all the witnesses on a certain subject were interested and some intensely hostile. For just such reasons is the fact finder's judgment valuable. He saw the witnesses and observed their demeanor. He could best evaluate and discount prejudices and hostility, could measure and determine by the yardstick of human experience the outward manifestations of a man lying or telling the truth, and find a sound conclusion by piecing together the full truths and the half truths which find corroboration in other oral testimony or better still in documentary evidence.

 We have, as did the District Judge, read this entire testimony and are unwilling to override the presumptive correctness of the master's conclusions. There was much evidence to support them (admittedly denied on many material points) and it undoubtedly was the staunchness of the assertions and not the vehemence of the denials which caused him to form his opinion in favor of appellant.

If we try to ascertain the truth by searching for reasons for human conduct, the following facts are significant:

(1) The association would be the one immediately and primarily interested in appellant's cut rate practices, and not the union, inasmuch as (a) Finn paid the appellee union's scale of pay, (b) Finn was willing to hire members of appellee union, and (c) Finn was desirous of having his men join the appellee union;

(2) Because of such primary interest the association might have instigated picketing by the appellee union: (a) pickets were paid in cash and there is some evidence to the effect the cash was furnished by the association; (b) the cash books of the union showed no expenditure for pickets; (c) the sole result of picketing was that appellant lost "stops" to members of the association;

(3) A great many members of the union were members of the association which fact would actuate one organization to aid and co-operate with the other;

(4) At a meeting before an N. R. A. official (presumably impartial) attended by representatives of appellee union, a tentative agreement was effected requiring the union to furnish Finn men—cogently indicating that he wanted such workers—had asked for them and had been refused;

(5) No absolute proof was made as to Finn's gangster connection so that appellees were acting to injure another merely upon belief or suspicion and without sound reason, except self-protection or self-promotion;

(6) The fact that the written wage agreement between the union and the association makes no mention of the alleged agreement that the union only furnish men to members of appellee association would not refute a tacit agreement to that effect inasmuch as it is conceded by the master and the District Court that such an agreement would be illegal.

Our conclusion is that the presumption of correctness which attaches to the master's findings was not overcome. Were there no findings by the master or by the court, we would have reached findings similar to those found by the master.

A determination of the nature and character of the conspiracy is necessary to ascertain the participants in it, as well as the extent of the relief which should be awarded to appellant.

There is a vast difference between criminal and civil conspiracies. In fact, the latter may be divided into harmful or injurious, which may be actionable, and harmless, which of course is not actionable. In fact, individuals may conspire to accomplish a laudable object.[2]

---

2 As an illustration, it is not uncommon to learn of a group of men conspiring to persuade a deserving, outstanding citizen in their community to accept the nomination for political office.

At common law the existence of a criminal conspiracy could be established without proof of any act to further its object. Under the Federal statute a criminal conspiracy as there defined requires, in addition to the unlawful association, the existence of an overt act. However, the overt act may in and of itself be harmless. Criminal conspiracies may therefore be committed although no one is damaged. In actionable civil conspiracy, on the other hand, damage is the gist of the offense. Jones v. Monson, 137 Wis. 478, 119 N.W. 179, 129 Am.St.Rep. 1082; Wyeman v. Deady, 79 Conn. 414, 65 A. 129, 118 Am. St.Rep. 152, 8 Ann.Cas. 375; Boston v. Simmons, 150 Mass. 461, 23 N.E. 210, 6 L.R.A. 629, 15 Am.St.Rep. 230; Morris & Co. v. Nat. Ass'n of Stationers (C.C.A.) 40 F.(2d) 620, 626.

The alleged conspiracy in the instant case had for its object the prevention of appellant's successful entry into, and prosperous operation of, a scavenger business in Chicago. Back of this object was the desire of appellees to maintain prices. They feared that appellant would not maintain prices; hence war was waged upon it. Having concluded that a conspiracy of this nature existed, we are likewise of the opinion that International Brotherhood of Teamsters, Chauffeurs, Stablemen & Helpers of America, Local No. 731, Chicago Suburban Ash & Scavenger Corporation, Rogers, Monahan, Boss, Bohlman, Hess, Johnson, Grayson, and Boberg were parties to it. Both the master and the District Court found that Courtney, State's Attorney of Cook County, was not a party. He was, however, represented by one Capt. Gilbert, whom the master found was, after the N. R. A. meeting, in the conspiracy. The District Court did not agree with the master in this respect and found Capt. Gilbert was not a party to the conspiracy.

It is claimed for State's Attorney Courtney that he was prompted by worthy motives and that he wished to avoid the results which followed over-zealous and over-bitter competition in an industry so widely used by the public. On the other hand, it is argued that Courtney was prompted by a desire to win favor with a group with strong political connections and that his representative dragged him into active participation in the conspiracy with the other appellees who were relatively strong in vote producing circles. While we recognize that among public officials the influence of large voting groups is perhaps as great as the use of large sums of money, we are not justified in substituting suspicions for facts. In other words, we accept the finding of the District Court that neither Courtney nor Gilbert was a party to a conspiracy to ruin appellant's business or prevent his entry into the scavenger business.

Having reached a conclusion on the vital issues of the case, the issues of fact, we can more readily decide the other questions.

We are clearly of the opinion that no labor question is involved, and the District Court was not therefore denied jurisdiction by reason of the labor injunction act (Norris-La Guardia Act, 29 U.S.C.A. §§ 101–115). Three decisions of this court [Lauf v. Shinner & Co., 82 F.(2d) 68; United Electric Coal Companies v. Rice, 80 F.(2d) 1; Laclede Steel Co. v. Newton, 80 F.(2d) 636] are decisive of this question. By no stretch of reasoning can we find a labor question involved in this controversy.

Likewise, we are not prepared to hold that incorporation in a state other than Illinois, in order to establish diversity of citizenship, was collusive, or fraudulent, or would, for any other reason, bar the Federal court of jurisdiction. It is action by Congress which determines the jurisdiction of inferior Federal courts. The Congress has seen fit to make diversity of citizenship one of the grounds of Federal court jurisdiction. Likewise, the domicile of the corporation is the state of its incorporation at least for the purpose of determining Federal court jurisdiction. We must apply the law as we find it.

Finn was permitted to do business as an individual or he could incorporate if he chose so to do. He might incorporate in Delaware to conduct a business solely in Chicago. Again we might add, we must apply the law as we find it. We are not making the law. The reasons for his action were personal to him. They might be to avoid taxes or to better engage in wild financing or to restrict director's or official liability or for many other reasons, some of which may be more laudable. Finn, in the case before us, feared trouble with competitors and anticipated a bitter, ruthless, competitive warfare. He anticipated litigation and preferred to submit his right to engage in and carry on a scavenger business in Chicago to the Fed-

eral courts. To do so he felt disposed to incorporate in a foreign state. In so doing he acted within his rights, as decided by the Supreme Court in Black & White Taxi Co. v. Brown & Yellow Taxi Co., 276 U.S. 518, 48 S.Ct. 404, 72 L.Ed. 681, 57 A.L.R. 426.

The conspiracy was one to ruin appellant's business. Therefore the means adopted were unlawful. The actionable character of the means may be and often is determined by the use to which they are put. If, therefore, individuals conspired to commit the wrongful act of ruining appellant's business, the means, even though of themselves innocent, were actionable. Aside from whether the picketing was peaceful (American Steel Foundries v. Tri-City Central Trades Council, 257 U.S. 184, 42 S.Ct. 72, 66 L.Ed. 189, 27 A.L.R. 360), it was unlawful when its object was as here disclosed. In this case the picketing was well-nigh a boycott and most effective in accomplishing its object, which was to keep appellant out of the scavenger business. It was wrongful.

The decree of the District Court is reversed, and the court is directed to enter one in accordance with the views above expressed. The decree should direct the dismissal of the suit against those not included in the conspiracy. Those found to be in the conspiracy—namely the appellees International Brotherhood of Teamsters, Chauffeurs, Stablemen and Helpers of America, Local No. 731, Chicago Suburban Ash and Scavenger Corporation, E. J. Rogers, Larry Monahan, Matt Boss, Fred A. Bohlman, Arthur H. Hess, William B. Johnson, Joseph H. Grayson and Neils Boberg, should be enjoined from interfering with appellant's business by picketing or otherwise, or in any way carrying into effect the unlawful conspiracy charged and established.

Appellant shall recover its costs in this court against the above named appellees.

The appellees Courtney and Gilbert, and Peter Braeckman, William Venema, Arthur J. Criel, C. Groot, Edward Wendel, William Wischmeyer, Charles E. Larson, Daniel Teune and Harry Marks shall recover their costs against the appellant in this court.

The decree of the District Court for costs is reversed and the District Court

will apportion the costs in that court as the equities and successes of the parties require.