**CONNOLLY v. GISHWILLER et al.**

No. 9241.

Circuit Court of Appeals, Seventh Circuit.

June 19, 1947.

Rehearing Denied Aug. 7, 1947.

Otis F. Glenn, Raymond G. Real, and Otto W. Barnes, all of Chicago, Ill., for appellants.

Theodore E. Rein and Morton C. Chesler, both of Chicago, Ill., for appellee.

Before SPARKS, MAJOR, and KERNER, Circuit Judges.

KERNER, Circuit Judge.

Harry E. Hallenbeck as receiver of Calumet National Bank of Chicago originally brought this action to recover alleged illegal profits claimed to have been derived by defendants, pursuant to a conspiracy, through the sale of various assets of the receivership for less than their actual value. Appellee, under appointment by the Comptroller of the Currency, is the present receiver of the bank. There were originally thirty-two defendants. When the decree

was entered, appellants were the only defendants held liable.

The material allegations of the complaint are that defendant Gishwiller was employed by the Calumet Bond & Investment Company as a clerk and an assistant to various officers and by the bank when it was solvent; that she thus became familiar with the business of both corporations and that upon the bank's suspension she was employed by the various receivers; that Gishwiller, Cramer, Gans, and others of the defendants entered into a scheme and conspiracy to acquire the assets of the bank receivership at prices fraudulently less than the fair value thereof, in which scheme Gishwiller was to use her position and information and do everything in her power to further the objects of the conspiracy; that false or inadequate appraisals of the value of the assets were procured and submitted to the receiver and to the Comptroller of the Currency; that false representations were made that such prices were the full and fair market value; that Cramer acted as ostensible broker, and while pretending to act as broker, falsely represented to the receiver that he had obtained a purchaser at a given price, and in reliance upon such representations the receiver obtained authority from the Comptroller and the approval of the court to consummate the transactions initiated by defendants; that conveyances were made to nominees of defendants before payments for the assets were made, mortgages placed upon the assets and the proceeds used by the conspirators as they saw fit and paid to the receiver as and when such payments were convenient; that sometimes the proceeds of one asset would be used to acquire additional receivership assets; and that the conveyances so made to the nominees were thereafter sold for a greater price and the inadequate consideration was paid to the receiver.

The complaint prayed discovery, that an account be taken, and that defendants be ordered to pay to plaintiff such sum or sums as may be due; that the assets of the Investment Company acquired by the use of the properties or proceeds of properties fraudulently obtained from the receiver be adjudged to constitute a trust fund; and that defendants be decreed to execute such instruments of conveyance as shall be necessary to vest title in the receiver.

After defendants had filed answers denying the essential allegations of the complaint, the cause was referred to a master to take testimony and report the same with his findings of facts and conclusions of law. The master took the testimony of 68 witnesses, reported 9,896 pages of testimony, and admitted in evidence over 1,200 exhibits. He found that there was a conspiracy to defraud the Calumet National Bank receivership and that Cramer, Gishwiller, the Calumet Bond & Investment Company, Glenn R. Gans and others were parties thereto. He recommended a decree in accordance with the prayer of the complaint. Exceptions to the master's report were filed and overruled. The court found that all of the material allegations of the complaint were sustained by the evidence and a decree was entered that the reports of the master "are * * * hereby approved, confirmed and adopted by the Court as and for this Court's findings of fact, and by express reference said findings of said Master in each of said reports are hereby incorporated in this Decree with the same force and to the same effect as if said findings were in haec verba herein expressly stated and found, * * *." The decree orders that plaintiff shall recover from the Calumet Bond & Investment Company $7,900.55 and from Fern Gishwiller $16,-889.17 The decree states: " * * *. it being the intention and purpose of this Decree that the joint and several liability of the said defendants for money damages shall not exceed the aggregate sum of $16,889.17 and costs of suit." It also directs these defendants to convey to plaintiff certain properties described in the decree.

Calumet National Bank was closed by the Comptroller of the Currency on October 1, 1931, and James C. White was appointed receiver and continued to act as such until his death. June 22, 1932, Clarence F. Buck was appointed receiver to succeed White and continued to act as receiver until April 22, 1936.

Calumet Bond & Investment Company is an Illinois corporation engaged in the general mortgage and investment business.

Fern North Gishwiller was employed by the bank and the Calumet Bond & Investment Company in 1924. She was a stenographer in the trust department of the bank and a bookkeeper-stenographer for the Investment Company. She was retained by White and then by Buck as a stenographer, and in October, 1932, she was directed to, and thereafter did, keep the books of the receivership. As Buck's confidential clerk and assistant she was given a wide range of power and discretion. She was entrusted with the duty of keeping the books of the receivership, compiling the receiver's reports, contacting appraisers, and contacting and corresponding with brokers and others. She met Richard Cramer in February or March, 1935.

In 1933 Gishwiller began negotiations to acquire all of the capital stock of the Investment Company. By April, 1936, she had acquired all of the capital stock, and the Company was housed in a building formerly owned by the receivership, which had been obtained through Cramer's efforts and conveyed to the Investment Company, of which Cramer was president, and Gishwiller was secretary and treasurer. In the summer of 1937, while the affairs of Cramer, Gishwiller and the Investment Company were being investigated by a National Bank examiner, Gishwiller and Cramer left Chicago. They planned a trip, going from New York by steamship through the Panama Canal to the West coast.

On June 8, 1937, Gishwiller visited the office of the Comptroller of the Currency at Washington, D. C., where she interviewed the Supervisor of Insolvent Banks. She testified that she told him she had heard nothing in connection with the investigation of the bank receivership; that the Supervisor sent her to the office of the counsel for the Comptroller; that she called upon this counsel and told him of the purpose of her visit and that if her presence would be required she would abandon her trip through the Panama Canal; that the Comptroller's counsel advised her that the report in connection with the bank receivership had not been received; that it could not pass through the various departments for final action prior to the time she had indicated she would return to Chi-

cago; and that she was told she could proceed on the contemplated trip, with assurance that her presence would not be required in connection with the investigation prior to July 1, 1937. From Washington, Cramer and Gishwiller proceeded to New York, where they boarded a steamer on June 12, 1937. They returned to Chicago on July 1, 1937.

Richard Cramer, another defendant, had been a real estate operator. He died in November, 1945, prior to the entry of the decree. In November, 1933, Cramer was employed by the Home Owners' Loan Corporation and remained there until January, 1935, when he re-entered the real estate business under the name of Cramer, Foot & Co. About this time he contacted Buck with the view of purchasing or selling some of the assets of the bank. According to the testimony of both Buck and Cramer, Cramer suggested to Buck that he would like to acquire the assets of the receivership, but could not make purchases in his own name because of judgments against him; that he would submit the offers with some variations in form so that his creditors, upon inquiry, could not ascertain whether Cramer was buying for himself or for a client.

Cramer testified that he told Buck that in many instances it would be necessary to place a mortgage on the real estate to secure sufficient funds to pay for the asset and that Buck agreed that in such cases he [Buck] would give Cramer title papers and other documents, in trust, to enable him to mortgage the property. Buck testified that he told Gishwiller that deeds were to be delivered to Cramer on his receipts without the payment of money.

Glenn R. Gans, another defendant, was a real estate operator who had had transactions with Cramer for many years, and in some of the sales involved in this case, he shared in the commissions. He became deceased on February 20, 1946. He was not a witness in the case. In the spring of 1935 he was sent by Cramer to the office of the bank where he was interviewed by Gishwiller upon the subject of furnishing appraisals for the receivership assets, but Buck never spoke to or saw Gans. Buck testified that Gishwiller told him that a man named Gans had been in the office solicit-

ing the business of making appraisals, that he looked up Gans before he [Gans] made any appraisals and made up his mind to employ him. Commencing in the spring of 1935, offers and proposals came from Cramer, along with letters of recommendations for their acceptance addressed to the Comptroller, prepared for Buck's signature and signed by Buck, but invariably phrased in Gishwiller's language. Appraisals for the assets furnished by Gans were forwarded to the Comptroller with these letters of recommendation, which matched Cramer's offers and were calculated to reflect, not the true value of the property, but, rather, to induce acceptance. In some instances Gans' appraisals were higher than the offers submitted by Cramer, but in most of the cases since these operations began, Gans' appraisals were that each asset possessed about the same value as the price offered by Cramer.

The record discloses that titles to properties belonging to the receivership were delivered to Cramer without payment, which were sold and sometimes mortgaged by him. Sometimes the receiver would be paid, when it suited the convenience of Cramer and his associates, out of the proceeds of such resales or mortgages and sometimes such proceeds were used to acquire other assets of the receivership. In the period from May 1, 1935, to December 31, 1936, the receivers had twenty transactions with Cramer, through which forty-five assets of the receivership were liquidated. Of the twenty transactions, eighteen, involving thirty-three assets, are the basis of this action.

It was not until after Buck's resignation in April, 1936, and Harry E. Hallenbeck had succeeded him as receiver that a disclosure was made as to a certain asset of the receivership, which opened an inquiry resulting in the institution of the present proceedings. Hallenbeck discovered a carbon copy of a letter to the Chicago Title & Trust Company certifying that Buck had received payment in full for the sale of this asset, but which had not in fact been paid. He requested an explanation from Gishwiller as to why the money had not been paid. He was advised by her that the money was being held in escrow, but examination of the title records concerning the asset disclosed that the property had been conveyed twice and mortgaged some seven months earlier, and that the proceeds of the mortgage had been paid to Cramer about nine months before the discovery of the shortage. One Christianson, also a defendant, called as a witness for plaintiff, testified on direct examination that Cramer came to his office and said that he [Cramer] owed the receiver $18,500 for this asset and that it was necessary that he repay the sum immediately, that he was in a jam. On re-direct examination he was asked, "Now, did Mr. Cramer say to you at the first or second conversation about which you have testified that he, Richard Cramer, with the help of Fern North Gishwiller, had been buying assets of the Calumet National Bank receivership cheaply and that he was in a jam?" and to this question he answered, "That is approximately what was said. That is the same thing that I said before." Cramer's version of this conversation was that he told Christianson "that a fellow by the name of Gell had been running around saying that Mrs. Gishwiller had helped me get some of the securities from the bank there, and that they were investigating, and as far as I was concerned I had my dealings with Buck, * * *."

■ At the outset we are met with the contention that neither the District Court nor the master made findings of fact and stated conclusions of law. We have difficulty in believing that appellants are in earnest in making such a contention. Rule 53 (e) (2) of the Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c, provides: "In an action to be tried without a jury the court shall accept the master's findings of fact unless clearly erroneous." A plain reading of the master's report discloses that he made exhaustive findings of fact as required by Rule 52(a) of the Federal Rules of Civil Procedure, which provides: "The findings of a master, to the extent that the court adopts them, shall be considered as the findings of the court." Since the court adopted the findings of the master, it cannot be said that the District Court made no findings of fact.

We pass now to a consideration of appellants' major contention that the decree is not supported by the evidence.

The argument is that the record contains no evidence of a conspiracy. They insist that every asset was sold, personally, by the bank receivers, after offers had been submitted to them by Cramer, and that the price was fixed by conference between the receivers and Cramer and approved by the Comptroller after all of the facts concerning the asset were submitted to him together with an appraisal of the property; that Mrs. Gishwiller on no occasion negotiated for the sale of an asset or recommended an acceptance of any offer submitted by Cramer; and that in no instance did she participate in the profit on the sale of an asset or the resale thereof by Cramer.

The gist of this action is for damages resulting from various claimed wrongful acts of Cramer and Gans and appellants Gishwiller and the Investment Company, Eschman v. Huebner, 226 Ill.App. 537, 555, and Scavenger Service Corp. v. Courtney, 7 Cir., 85 F.2d 825, 832. Appellee insists that the wrongful acts began in the spring of 1935 when appellants united with Cramer to acquire the assets of the bank receivership at prices fraudulently less than their fair value.

The record presents a case where considerable of the evidence is conflicting. In such a case it is the province of the master and the trial judge to harmonize the testimony in so far as that is possible, and in case of conflict to decide as to the weight and credibility to be given the testimony of the various witnesses. While it is true that in the instant case a conflict exists as to some of the evidence, yet the material evidentiary facts are practically undisputed, leaving only the question of the inferences to be drawn therefrom, the legal principles by which such facts and inferences should be interpreted, and the legal obligations which arise out of the application of such legal principles to such facts and inferences.

Fraud, in its general sense, comprises all acts, omissions and concealments involving a breach of legal or equitable duty, trust or confidence and resulting in damage to another. Diversey v. Johnson, 93 Ill. 547, 560. There is no general rule for determining what facts will constitute fraud, but it is to be found or not according to the special facts of each particular case. It is rarely susceptible of direct proof, but must ordinarily be established by circumstantial evidence and legitimate inferences arising therefrom, which, taken as a whole, will show the fraudulent intent or purpose with which the party acted. The inferences to be gathered from a chain of circumstances depend largely upon the common sense knowledge of the motives and intentions of men in like circumstances. Philadelphia Storage Co. v. Kelley-How-Thomson Co., 8 Cir., 64 F.2d 834, 837; Garlick v. Imgruet, 340 Ill. 136, 143, 172 N.E. 164. And while fraud is never presumed, it may be proved by circumstances which convince the mind of its existence. Commercial Merchants Bank v. Kloth, 360 Ill. 294, 306, 196 N.E.2d 214. A conspiracy is very nearly always from the nature of things, provable only by circumstantial evidence, by inferences reasonably deducted from facts proven. It may be inferred from the nature of the acts complained of, the individual and collective interest of the alleged conspirators, the situation, the intimacy and relation of the parties at the time of the commission of the acts, and generally all of the circumstances preceding and attending the culmination of the claimed conspiracy.

In the case of Lange v. Heckel, 171 Wis. 59, 64, 175 N.W. 788, 789, the court said: "Conspiracy is a line of endeavor the success of which is not promoted by advertising. Direct proof of the illegal combination is generally locked within the breasts of the conspirators, and the ultimate fact of the corrupt agreement, if proved at all, must be inferred from established facts and circumstances." And in the case of People v. Small, 319 Ill. 437, 449, 150 N.E. 435, 440, it was said: "A conspiracy may generally be inferred from circumstances. It is seldom that any one act, taken by itself, will establish a conspiracy, but, when taken in connection with other acts, it may appear clearly that the series of wrongful acts result from concerted and associated action. Considered separately, the acts of a

conspiracy are rarely of an unequivocally guilty character, and they can be properly estimated only when connected with all the surrounding circumstances. Where a conspiracy is once established, every act and declaration of each member in furtherance of the common design is, in contemplation of law, the act and declaration of all the members and is therefore original evidence against each of them." See also Dixmoor Golf Club v. Evans, 325 Ill. 612, 624, 156 N.E. 785.

 It is true that in this case appellee has not proved any formal agreement concerning a concert of action between Gishwiller, Cramer, Gans and the Investment Company for the purchase and sale of the receivership assets. However, in the period from May 1, 1935, to December 31, 1936, there were thirty-three items of real and personal property involved. The acts and conduct of each defendant as to each asset with reference to the offers by Cramer were gone into—the dates and terms and circumstances touching the presentation of the offer, the action of the receiver, the transfers by the receiver and the conveyances following the transfers, with names, dates and amounts specified, and the profits claimed to have been made upon each transaction—and specific findings as to each asset were made by the master. It would unduly lengthen this opinion were we to set out in detail and review all of the evidence concerning these items. It will be enough to say that we have examined the record and studied with care the evidence relating to all the transactions, and when considered in conjunction with all the facts shown in evidence and tested in the light of the applicable principles above enunciated, we cannot say that the trial judge was not warranted in arriving at the conclusion and making the findings that the appellants and Cramer and Gans acted in concert and perpetrated a fraud upon appellee's predecessors. At any rate, the question being solely one of fact, we are required under the now well established rules to accept the findings unless they are clearly erroneous. Rule 52(a) of the Federal Rules of Civil Procedure. See also Santa Cruz Oil Corp. v. Allbright-Nell Co., 7 Cir., 115 F.2d 604, 607; Columbian Nat.

Life Ins. Co. v. A. Quandt & Sons, 9 Cir., 154 F.2d 1006; and In re Van Sweringen Corp., 6 Cir., 155 F.2d 1009, 1011. Even though we are free to draw the ultimate inferences and conclusions which the evidentiary findings reasonably induce, Bach v. Friden Calculating Mach. Co., 6 Cir., 155 F.2d 361, 364, we are unable to say that the findings are clearly erroneous.

Finally, appellants claim error in that the court issued an injunction restraining the sale or other disposition of real estate owned by them, and appointed a receiver for the Investment Company.

The argument is that no service of process was had upon Gishwiller or any officer of the Investment Company at the time of the appointment of the receiver and the granting of the injunction, and that at the time of the application for the appointment of a receiver, plaintiff was "nothing more than an unsecured creditor" and as such had no right, legal or equitable, in or to the property of the Investment Company. In support of the argument the cases of Pusey & Jones Co. v. Hanssen, 261 U.S. 491, 43 S.Ct. 454, 67 L.Ed. 763, and De Beers Consolidated Mines v. United States, 325 U.S. 212, 65 S.Ct. 1130, 89 L.Ed. 1566, are cited. These cases we have examined and from the facts here appearing, have concluded that they are inapplicable.

The record discloses that the verified complaint filed June 18, 1937, prayed for the appointment of a receiver for the Investment Company and for an injunction restraining defendants from selling or otherwise disposing of certain real estate. The complaint set forth in detail the charges of fraud and conspiracy: that certain described assets belonging to the receivership had been illegally obtained and that other described parcels of real estate had been acquired by the defendants with moneys or property wrongfully obtained by defendants from the receivers or with the profits obtained by defendants from the resale or other disposition of the properties wrongfully acquired by them from the receivers. It was upon these allegations that the request for the restraining order, temporary injunction, and the appointment of a receiver was made and granted.

The restraining order was entered on June 19, 1937, and on June 25, the court appointed the receiver. On June 19 service was had upon the Investment Company. On July 7 Gishwiller was served, and copies of the orders that were entered on June 19 and June 25 were delivered to her. On July 9, 1937, one Harry Biossat entered his appearance as attorney for appellants and as such appeared before the court on July 14, 1937, when the court entered the order granting the temporary injunction and denied Investment Company's motion to vacate the order appointing the receiver.

It is elementary that the appointment of a receiver and the granting of a temporary injunction rest, in view of all the circumstances of the case, within the sound judicial discretion of the trial judge, whose discretion will not be disturbed except for abuse. Chicago Title & Trust Co. v. Mack, 347 Ill. 480, 180 N.E. 412; Russell v. Farley, 105 U.S. 433, 439, 26 L.Ed. 1060; Harriman v. Northern Securities Co., C.C.N.J., 132 F. 464, 475; and Hoy v. Altoona Midway Oil Co., C.C.Del., 136 F. 483, 484. It is true, of course, the power to appoint a receiver is a drastic, harsh and dangerous one and should be exercised with care and caution. It is most usually called into action for the purpose of promoting the ends of justice. In discussing this power, the court in the case of Chicago Title & Trust Co. v. Mack, supra, 347 Ill. 483, 180 N.E. 413 said: "It had its origin in the English Court of Chancery at an early date, and it was incidental to and in aid of the jurisdiction of equity to enable it to accomplish, as far as practicable, complete justice among the parties before it, the object being to secure and preserve the property or thing in controversy for the benefit of all concerned pending the litigation, so that it might be subjected to such order or decree as the court might make or render."

In our case the court was confronted with the problem of either preventing the defendants from concealing or disposing of the assets or of allowing them to make away with the fruits of the fraud charged against them. Under the circumstances and in view of this record we cannot say that the court abused its discretion when it appointed the receiver and awarded the injunctive relief to preserve the status quo pending the litigation.

The decree of the District Court will be affirmed. It is so ordered.