**INTERNATIONAL NIKOH CORPORATION, Plaintiff-Appellant,**

v.

**H. K. PORTER COMPANY, Inc., Defendant-Appellee.**

**INTERNATIONAL NIKOH CORPORATION, Plaintiff-Appellee,**

v.

**H. K. PORTER COMPANY, Inc., Defendant-Appellant (two cases).**

**INTERNATIONAL NIKOH CORPORATION, Plaintiff-Appellee,**

v.

**LOMBARD CORPORATION, Defendant-Appellant (two cases).**

**Nos. 14982–14986.**

United States Court of Appeals
Seventh Circuit.

Feb. 28, 1966.

Sydney G. Craig, Chicago, Ill., John H. Morgan, Pittsburgh, Pa., Martin Gross, Chicago, Ill. (Martin, Craig, Chester & Sonnenschein, Chicago, Ill., Eckert, Seamans & Cherin, Pittsburgh, Pa., of counsel), for H. K. Porter Co., Inc.

Charles R. Holton, Chicago, Ill., for Lombard Corp.

Don H. Reuben, Lawrence Gunnels, Frank Cicero, Jr., Chicago, Ill., Kirkland, Ellis, Hodson, Chaffetz & Masters, Chicago, Ill., of counsel, for International Nikoh Corporation.

Before KNOCH, CASTLE and KILEY, Circuit Judges.

KILEY, Circuit Judge.

This is a diversity action to recover damages for the alleged fraud and misrepresentations of the two defendants, H. K. Porter Company, Inc. and Lombard Corporation. In Nos. 14983 through 14986, they appeal from judgments entered against them for $56,860.00 and $81,239.99, respectively, in favor of International Nikoh Corporation; in No. 14982 International appeals from its judgment against Porter, challenging the court's theory of damages. We reverse in part and affirm in part.

The suit is based on the purchase by International, for $150,000.00, in 1959, of a "continuous hot weld pipe mill" owned by Porter. Earlier in 1959 Porter had acquired the mill from National Electric Products Corporation which had built it in 1950 to produce "heavy wall conduits" of ½-inch to 2-inch diameters.[1] The transaction was arranged by Lombard,[2] an intermediary, and effectuated through sale of the mill by Porter to Lombard and a sale by Lombard to International. The contract between Lombard and International was dated June 23, 1959; that between Porter and Lombard, reciting "entered into as of this day of July 1959," was executed on August 5, 1959. After the mill was shipped to International and installed, difficulties arose with respect to missing parts and the mill's operation.

On December '5, 1960, International wrote Porter that the mill had not produced the pipe as "guaranteed" and gave Porter ten days to furnish it with a schedule of what action Porter expected to take "and when we may expect the guaranteed production." On December 15, Porter responded, stating it sold to Lombard on a "where is and as is" basis, denying any contractual relationship with International, and denying that it gave any guarantees to International or "to anyone." This suit followed.

The complaint, so far as relevant here, charged fraud against Porter in knowingly misrepresenting to International, through Lombard, the production capabilities of the mill, and charged fraud against Lombard in falsely representing its authority to warrant the mill's capacity and to effect a sale, falsely representing that Porter would guarantee the mill's commercial production, and in concealing from International Porter's refusal to so guarantee.

The district court found for International, but applied equitable principles in assessing damages against Porter and Lombard. The court's conclusions were that Porter, having "made representations" with respect to past production operations of the mill which were "incomplete and therefore inaccurate, may not in equity" benefit; that Lombard, by its concealment of facts from International, was "guilty of misrepresentation" and liable for resultant damages; that International, because of its pre-purchase knowledge and the "low price" paid for the mill, took an "entrepreneurial risk" hoping for a great return on a small investment and "is not entitled to recover those damages proximately resulting from its assumed risk"; and that neither Porter nor Lombard is entitled to recover "any amount" from the other.

A principal question is raised by International's contention that on its finding of fraud the district court failed to apply the correct measure of damages. We do not accept the premise that the court found Porter guilty of fraud, nor do we accept Porter's contention that because all parties agree[3] the court erroneously as-

1. Porter also hired several former officers and employees of National Electric, including the person who originally designed and built the mill.

2. Lombard was informed by National Electric in May, 1958, that the mill was for sale, and Porter gave Lombard written authority to negotiate the sale in February, 1959.

3. All three parties claim the court erred in applying equitable principles to the legal issues presented, International complains in its brief that the court thereby unduly limited its damages to "the amount Porter *actually received* from the transaction," a "restitution theory." (Emphasis in original.) This the court did do. Porter and Lombard complain because fraud was alleged, and if it was not proven they contend they should not be liable.

sumed equity jurisdiction, there is no basis for awarding any damages against Porter.

The issue at the trial centered upon the various representations of Porter to International, through Lombard, with respect to the history of the capacity of the mill to produce ½-inch and ¾-inch pipe and its future capacity based on International's restoration of parts, minor repairs, and operation under conditions similar to those in which the mill had been previously operated.

The court made three relevant factual findings concerning the production record of the mill under National Electric:

74. In the ten years from 1950 through 1959 between six and ten million feet of half-inch pipe were produced on the mill by National. This represents less than four months production at the speeds which Porter represented the mill had been operated. While production records are incomplete, they indicate that this limited production was achieved in the three years 1950–52 when the mill was run intermittently but with frequent mechanical failures and other production problems.

75. Not over 300,000 feet of three-quarter inch pipe was made on the mill at any time. Such a negligible quantity does not constitute commercial production operation.

76. No pipe of any kind was produced on the mill after February, 1955, and the mill was abandoned.

The court then found that, "read in context," Porter's representations "can only be interpreted" to mean that the mill had operated as an "economical production unit manufacturing commercially acceptable ½" pipe in production quantities at 250 ft. per minute and commercially acceptable ¾" pipe in production quantities at 200 ft. per minute"; and that with replacement of various parts and minor repairs, the mill should and could again produce that pipe at those speeds.

The court's conclusion of law was not that Porter was guilty of fraud, but that its "representations with respect to past production operations * * * were incomplete and therefore inaccurate," and that Porter may not *in equity* benefit therefrom. Furthermore, the court discriminated between Porter's representations and the "deliberate withholding" of facts and "misrepresentations" by Lombard. Finally, the court granted relief upon an equitable theory. We decide the court did not find Porter guilty of fraud.

We think there is substantial support for the court's interpretation of the representations made by Porter. There is substantial evidence to support the following findings: In March, 1959, International had been informed by Lombard that "they have * * * indicated" the mill would produce ¾-inch pipe at the rate of 250 feet per minute. Representatives of International on two occasions in March, 1959, inspected the mill without restriction; on one occasion a representative was informed that the mill had made pipe but that it had run very little and had not run for a long time; on the other occasion no inquiry was made of Porter employees concerning the mill, but the International representative suggested that it be sold to a "junk man." The mill had been partially "cannibalized," and it was apparent that parts were missing, damaged or in need of repair.

In April, 1959, Porter wrote Lombard that it was selling the mill "as is, where is"—International's personnel did not see this letter until the fall of 1960. Porter knew that Lombard had International as a prospective buyer and wrote Lombard that "we have run" ½-inch and ¾-inch pipe at 250 feet per minute and 200 feet per minute respectively.

In May of 1959, International insisted, in correspondence with Lombard, that the mill be complete to produce "commercially acceptable heavy wall rigid conduit" with the following speeds guaranteed *inter alia*: ½-inch, 250 feet per minute; ¾-inch, 200 feet per minute. Lombard informed Porter of these conditions of purchase. In response, Porter wrote Lom-

bard that it would guarantee that "we have run" pipes of those sizes at those speeds, and that if International operated under the same conditions Porter had, the mill "should" produce at the same speeds. Later, in response to an inquiry by International about the "guarantee," Porter wrote to Lombard:

*We are not guaranteeing speeds. What we do represent is as follows*: We operated the mill and made acceptable conduit on ½″ up to 300 ft. per minute. In the interest of higher quality, we operated at 250 ft. per minute over a period equivalent of about 1 million ft. of ½″ conduit. We ran ¾″ at approximately 200 ft. or slightly better. * * *

\* \* \* \* \* \*

We, of course, as we have said, are not guaranteeing anything in the operation of this mill and are only giving you above the data as we experienced in our operations of the equipment. (Emphasis added.)

Lombard, upon receiving this information, wrote to International on May 28, quoting Porter's answers verbatim but omitting the two italicized sentences and the last paragraph quoted above. Thus Lombard concealed from International Porter's refusal to guarantee speeds.

On June 8, 1959, International delivered to Lombard its purchase order containing provisions for seller (Porter) to provide, if necessary, parts and supervision to give the mill capacity to produce as guaranteed, and that "seller guarantees the Mill will produce ½″ pipe at 250′ per minute and ¾″ pipe at 200′ per minute." Lombard acknowledged receiving the order, responding: "We hereby undertake to obtain the guarantees. * * * These guarantees will run to us and we will * * * extend the same to you."

Lombard then prepared and delivered to Porter its purchase order, which, with non-relevant exceptions, was identical in terms to International's order. Porter persisted in its position with respect to the guarantees. It proposed in writing to Lombard for International a sale agreement on an "as is and where is" basis, with a warrant "only that it has operated" the mill to produce the pipe of the sizes and at the speeds subject of negotiation. This proposal was never executed. On June 23, Lombard signed and transmitted to International the acknowledgment copy of International's purchase order and substituted itself, with International's consent, as seller in that order. Thereafter Lombard suggested several drafts of a purchase agreement to Porter, and during this period declined to disclose to International its purchase contract with Porter on the ground that Porter had requested confidentiality, but stating that "we have agreed to give you a guarantee. * * *" On August 5, 1959, Lombard and Porter executed their purchase agreement for the mill for $100,-000.00, on a "where is and as is" basis, with Porter warranting and representing "only that it has operated" the mill to manufacture "acceptable ½-inch pipe at 250 feet per minute and ¾-inch pipe at 200 feet per minute" under specified conditions.

The mill was shipped and International's difficulties commencing operation of the mill began. Extensive correspondence between International and Lombard's office, with respect to missing parts and to getting the mill started [4] was carried on until, in March and April, 1960, International requested through Lombard the assistance of Porter to start up the mill on April 18. Porter personnel assisted without success until late October to bring the mill to commercial pro-

---

4. In several of the letters from International to Lombard, it is clear that International was relying on Lombard, e.g.: "[W]e cannot release you from any obligation under your contract. * * *"

\* \* \* \* \*

Again,

"You executed the acknowledgment of June 23, 1959."

And in a letter to modify "our previous agreements," Lombard's acceptance was sought.

duction. Lombard then complained to Porter of its failure to perform fully under the Lombard-Porter purchase agreement. A copy of this agreement, previously withheld, was sent to International.[5] Thereupon International wrote Porter claiming that Porter had entered the June 23, 1959, contract through its agent, Lombard, guaranteeing the pipe speeds, and that the mill was not capable of producing "according to your guarantees," and demanding notice of the action Porter proposed to take to fulfill "the guaranteed production." Porter rejected the demand, stating that its contract was with Lombard on a "where is and as is" basis and that it had made no "guarantees to anyone."

It is apparent from the district court's conclusion and its memorandum opinion that it did not consider Porter's conduct "a classic case of actionable fraud," as claimed here by International. The court's conclusion that Porter's representations "were incomplete and therefore inaccurate" is seemingly not based on the premise that the mill had not produced at the speeds represented. But rather that production was limited to a relatively short period of time, and in only intermittent runs with frequent mechanical failures and other production problems, none of which was disclosed to International. And that the actual quantities run were negligible (considering the speed representations and the time involved) and, specifically in regard to the ¾-inch pipe and inferentially in regard to the ½-inch size, this production did not constitute "commercial production operation." In essence, Porter had not limited the representations as it might have done.

■ Both International and Porter cite to this court the case of Johnston v. Shockey, 335 Ill. 363, 366, 167 N.E. 54, 55 (1929), in which the Supreme Court of Illinois stated six elements which plaintiff must prove by clear and convincing evidence to recover in an action for fraud:

(1) The misrepresentation must be in form a statement of fact;

(2) it must be made for the purpose of influencing the other party to act;

(3) it must be untrue;

(4) the party making the statement must know or believe it to be untrue;

(5) the person to whom it is made must believe and rely on the statement; and

(6) the statement must be material.

And "there is no general rule for determining what facts will constitute fraud, but it is to be found or not according to the special facts of each particular case." Connolly v. Gishwiller, 162 F.2d 428, 433 (7th Cir.), cert. denied, 332 U.S. 825, 68 S.Ct. 166, 92 L.Ed. 400 (1947).

■ But a classic fraud case does not embrace a purchaser who had inspected the mill, knew it had not produced for a long time and, as the district court commented during trial, "was obviously not capable of functioning on the day they examined it," and had failed to inquire of mill owner's employees who had operated the mill or of owner's officers who had the records of the mill's operations; nor does the classic fraud case embrace a purchaser who took the risk that the "junk" it bought could be made under "simulated conditions" to produce as a broker, not owner, guaranteed. We think the court could, and did, refuse to find Porter guilty of fraud under Illinois law, Johnston v. Shockey, supra, because the statements of fact about the production speeds were not misrepresentations and were not in themselves untrue, but were incomplete and inaccurate. Accordingly, the necessary elements of fraud are not present in the findings of underlying facts.

■ There is no merit whatever in Lombard's contention that the finding, with respect to its withholding of material information from International, is clearly erroneous. The facts underlying

5. Deleted from the copy sent to International was the paragraph indicating price and the "where is and as is" basis, and the month of execution was marked out.

290

that finding abundantly justify the challenged ultimate finding.

We turn to the claims of all the parties concerning the court's application of equitable principles to the legal issues. The court stated that its authority for its "exercise * * * of its equity power" in granting "appropriate relief" was Springfield & Northeastern Traction Co. v. Warrick, 249 Ill. 470, 476, 94 N.E. 933, 936 (1911). We agree with the parties that that case does not decide that a court may invoke equity in a law case. It does state that, assuming equity jurisdiction properly invoked, the court had broad power to grant relief "according to the court's own notion of what is reasonable and proper under the circumstances."

No statute, case or rule has been cited by the parties which prohibits the district court from granting the relief that it granted. There is no claim that equity has no jurisdiction over the parties or subject matter in this fraud case. The court had the power to grant equitable relief and if the evidence supports the relief granted and plaintiff were to amend its pleadings correspondingly, there would be no inconsistency between the case pleaded and relief granted. Rule 54(c) of the Federal Rules of Civil Procedure provides in pertinent part: " * * * every final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in his pleadings".[6]

■ Ordinarily relief which none of the parties desires should not be forced upon them.[7] Normally we would probably remand this case to the district court for more explicit ultimate findings and conclusions, because we cannot approve a decisional method governed solely by the factual "situation" without regard to the limitation imposed by the theories pleaded. This method used generally would tend to render personal and flabby the procedural discipline of tradition and rule. However, we think no good purpose would be served by remanding this unique set of facts for a decision less cryptic. Here the trial judge understandably thought an unjust result would follow a decision on the strict legal issue.

■ We think the relief granted here was suitable upon the facts, and under the circumstances more appropriate than the "all or nothing" theory of pleading in which the issues were first presented. Here, since International did not desire the result in that it received less damages than it sought, but certainly desired at least the appropriate relief granted which was supported by its proof, and the right to a jury trial is not at issue, there can be no necessity of amending its pleading to change from a legal to an equitable theory.[8] Remandment for purpose of an amendment would therefore avail nothing.

The district court did not conclude that Porter had wilfully misstated a material fact which was relied upon by International in purchasing the mill. The court decided that Porter's conduct fell short of fraud but equitably, because of its conduct, it would be unjust for Porter to enrich itself. We cannot say this was erroneous. This justified its award of recovery against Porter, and limitation of that recovery to the amount Porter received from the transaction, less the scrap value of the mill. As to Lombard we think it could have been found guilty of fraud in law as well as in equity, and has no cause to complain.

■ Lombard claims, and International agrees, that the court erred in failing to give Lombard credit for $12,309.22, for credit on open account to Porter,

6. The note of the Advisory Committee to subdivision (c) of Rule 54 states as to the portion quoted: "It makes clear that a judgment should give the relief to which a party is entitled, regardless of whether it is legal or equitable or both." 28 U.S. C.A. Rule 54, p. 203 (1960 ed.). For both general and specific analysis of Rule

54(c), see 6 Moore, Federal Practice ¶ 54.60, 54.62 (2d ed. 1953), and 1965 supplement; 2 id. ¶ 8.14, at 1714–15.

7. 6 Moore, Federal Practice ¶ 54.62, at 1208 (2d ed. 1953).

8. 6 id. ¶ 54.62, at 1208–1210.

which was extinguished as partial payment for the purchase price on the mill. The court did find that the credit was due Lombard and part of the payment to Porter, and Porter does not contest this. We hold that the court erred in failing to allow Lombard's cross-claim, and that the judgment against Lombard should be reduced by $12,309.22, while the judgment against Porter is accordingly increased by this amount.

Both defendants challenge the denial by the court of their post-trial motions for relief under Rule 60(b). We find no error in these rulings. International's post-trial motion under Rule 60(b), to reduce the judgment entered against Porter because of the post-judgment sale of the mill, was granted; we approve this modification of the judgment. We have considered other minor contentions raised and find them to be without merit.

The cause will be remanded for the modifications of the judgments in accordance with this opinion.